[Civ. No. 20331. Second Dist., Div. Two. Apr. 1, 1955.]

Estate of H. G. BUCHMAN, Deceased. HAMLIN K. BUCHMAN, as Executor, etc., Appellant, v. CLAIRE MORSE et al., Respondents.

Lloyd W. Dinkelspiel, Sr., and Morris Lavine for Appellant.

Jerry Giesler and George I. Devor for Respondents.

FOX, J.—Hamlin K. Buchman, executor of the estate of his late brother, Harry G. Buchman, has filed two appeals. One is taken from an order decreeing partial distribution in favor of Claire Morse, decedent's former wife, hereinafter termed respondent; the other is from an order settling certain accounts filed by appellant. Various assignments of error arising in connection with the disposition of the several proceedings herein are also presented for review and will be adverted to subsequently.

Respondent became the wife of the decedent on November 7, 1949. No children were born of this marriage. By the spring of 1951, marital differences and difficulties had developed between the spouses to a point which impelled decedent

to discuss with his then counsel, Isaac Pacht, the matter of negotiating a property settlement agreement with his wife. Thereafter, on about May 28, 1951, the decedent discussed with his attorney his desire to make a will, and submitted instructions as to the contents of the proposed document. On June 7, 1951, a form of will embodying these instructions was mailed to decedent in Chicago by his counsel. According to Pacht's testimony, this proposed will contained the following provision: "I declare that except as otherwise provided in this will I have intentionally and with full knowledge and not by accident or mistake omitted to provide herein for any of my heirs living at the time of my death. This includes specifically, but is not limited to, my wife, Claire Buchman (respondent)." There is no record that the proposed will was ever signed by decedent.

On June 29, 1951, decedent executed the will which was admitted to probate. It was a one-page document naming Hamlin K. Buchman as executor and contained two dispositive clauses, as follows:

"SECOND: I give, device (sic) and bequeath unto my beloved wife, CLAIRE BUCHMAN, one-fourth (¼) of my entire residuary estate.

"THIRD: I hereby give, devise and bequeath unto my beloved brother, HAMLIN K. BUCHMAN, three-fourths (¾) of my entire residuary estate, and in the event of the death of my wife CLAIRE before my death, then I devise and bequeath to my said brother, HAMLIN K. BUCHMAN, my entire residuary estate."

On July 2, 1951, respondent and decedent separated and thereafter maintained separate living arrangements. On August 2, 1951, a property settlement agreement was entered into by the spouses. Both parties had the benefit of independent legal assistance; decedent was, during the negotiations, represented by the firm of Pacht, Tannenbaum and Ross, while respondent employed Jerry Giesler as counsel. The agreement arrived at is fairly lengthy. In its preamble appear the following recitals:. "In addition to the other differences which have arisen between the parties, certain differences and disputes exist with reference to the property interests of the parties. The parties are the owners of certain property. Husband contends that all property, title to which is vested in him or for his account, is his separate property, and wife contends that certain of said property is community property of the parties. The parties are mutually desirous of making a

full, complete, permanent and final settlement of all of their respective rights in and to said property and any property which may hereafter be acquired by either of them, and, as a part of said settlement, each of the parties desires to relinquish any and all claims, past, present and future, against the property or estate heretofore or hereafter acquired by the other party, his or her executors, administrators, heirs, successors or assigns, and to finally settle, determine and dispose of all rights and matters of maintenance, support, inheritance, homestead, and each and every claim either party had, now has, or may have against the other party.''

The agreement contains 19 numbered paragraphs and two exhibits. The provisions most pertinent to the question with which we will be here concerned read as follows:

''2. Concurrently with the execution of this agreement Husband shall pay to Wife the sum of Two Thousand Five Hundred Dollars ($2,500.00) in cash, the receipt of which is hereby acknowledged.

''3. Upon the effective date of this agreement Husband shall pay to Wife the sum of Twenty-Two Thousand Five Hundred Dollars ($22,500.00) in cash.

''4. Husband does hereby transfer, convey, set over, assign and quitclaim to Wife, as her sole and separate property, any and all right, title and interest that Husband has in and to the following: (The items are set out in the margin.)[1]

''5. Wife does hereby transfer, convey, set over, assign and quitclaim to Husband, as his sole and separate property, any and all right, title and interest that Wife has in and to'' certain described property which it is not necessary to set out. Section (e) is pertinent and reads:

''(e) Any and all insurance policies owned by, payable to, or insuring the life or property of, Husband, a description of said life insurance policies being contained in the list of life insurance policies attached hereto, marked Exhibit B,[2] and which list is by this reference hereby incorporated herein. In connection with the said life and property insurance policies, Wife agrees to execute and deliver to Husband, at his request,

---

[1]The property referred to consists of all clothing, money, jewelry and personal effects in respondent's possession and all money and securities standing in her name; a 1949 Cadillac convertible; virtually all the furniture and furnishings in the apartment occupied by the parties; all the personal property and furnishings in storage; and all of respondent's personal effects in a certain house trailer.

[2]Exhibit B lists three life insurance policies, each in the amount of $10,000.

any and all assignments, quitclaims, changes of beneficiary and other instruments and forms which Husband may request to vest in Husband the complete ownership of said insurance policies, both legal and equitable, including the right to change the beneficiaries thereof free and clear of any claim, right, title or interest of Wife.''

''7. Each party hereto waives and relinquishes, except as in this agreement otherwise provided, any and all rights which he or she may now or hereafter have to succeed to the estate of the other; and each hereby expressly waives and relinquishes any and all rights to act as personal representative or to nominate a personal representative of the estate of the other, or to have set aside to him or to her any of the property of the other as community property, or to have set aside to him or to her by any Court having jurisdiction of any portion of the estate of the other any homestead or other property which might be set aside to a surviving husband or widow as exempt property, or to demand any family allowance, or any other right, benefit or emolument from the estate of the other, and both parties hereto agree that each will never exercise any right to select a homestead from the property of the other during his or her lifetime.

''8. It is expressly agreed between the parties hereto that this instrument is a full, complete and final memorandum of the agreement of the parties hereto covering all matters in connection with the division of the community property of the parties and all rights and claims of each and both of the parties therein or thereto, and in or to the separate property of either party, and of each and every claim of every character whatsoever one against the other, and that no agreement exists between the parties other than as herein specifically set forth; and it is hereby covenanted and agreed by each of the parties with the other that he or she will not assert or claim against the other any right or claim in or to any property of the other, except under the terms of this agreement, and except as provided by the terms and provisions of this agreement, and will not assert against the other except as herein otherwise specifically provided, any claim for alimony, maintenance or support, costs, attorneys' fees or any other claim whatsoever by reason of their marital relationship or otherwise, or in any action for divorce or separate maintenance, or in any other action or proceeding involving the marriage state or any obligations thereof wheresoever brought. . . .

''10 (b) Husband agrees to pay and hold Wife harmless

from obligations incurred by the Wife to the following creditors only and in amounts not exceeding the amounts set forth opposite the names of said respective creditors, to wit:

| | |
|---|---|
| Bullocks | $116.75 |
| Bullock's Wilshire | 201.48 |
| The French Bootire | 20.49 |
| Saks Fifth Avenue | 307.51 |
| Total | $646.23[*3] |

"13. All of the covenants, provisions and agreements in this instrument contained shall apply to, be binding and obligatory upon, not only the parties hereto but also their respective heirs, executors, administrators, successors and assigns. . . .

"16. Anything contained in this agreement to the contrary notwithstanding, it is expressly understood and agreed that this agreement shall be of no force or effect unless or until it shall be approved by the Court in divorce proceedings between the parties instituted in a court of competent jurisdiction and incorporated in and made a part of the decree or judgment of the Court in such proceedings, the parties hereby agreeing that this agreement shall be submitted to the Court in which any such proceedings are pending with the request that it be approved by said Court as being fair and equitable, and be incorporated in and made a part of the judgment or decree of said Court in such proceeding.

"17(b) Should this agreement be submitted for approval in a divorce action between the parties, and the Court fail to approve the same, then this agreement shall be of no force or effect, and said action shall thereafter proceed as an adversary action after reasonable notice thereafter given to each of the parties.

"18. The 'effective date of this agreement' hereinbefore referred to in this agreement shall be the day upon which a decree of divorce in favor of either party hereto shall be entered in an action brought as hereinbefore provided in paragraph 16.

"19. Concurrently with the execution of this agreement Husband shall deposit in trust with Pacht, Tannenbaum & Ross and with Jerry Giesler jointly, the respective attorneys for said parties, as trustees, $25,000.00 to be used by said trustees to discharge on his behalf the obligations referred to

---

[*3]In a letter written on the day the property settlement agreement was executed, decedent agreed to pay three additional bills that respondent owed, aggregating almost $500, "but none other."

in paragraphs 3 and 17(a)[4] hereof, and said trustees are here irrevocably authorized and instructed to pay said funds to the respective parties to whom payments are to be made pursuant to said paragraphs, upon the furnishing to each of said firms of attorneys of a certified copy of the decree of divorce referred to in paragraph 18 hereof.''

Upon execution of the agreement, respondent received and has retained the consideration of $2,500 noted in paragraph 2. The sum of $25,000 referred to in paragraph 19 was deposited in trust with counsel for the respective parties to discharge the obligations contemplated by the terms of paragraphs 3 and 17(a), where it has since remained. Ownership of the items of property designated in paragraphs 4 and 5 was assumed by the decedent and respondent as set out therein.

In the middle of August, respondent departed for Nevada. She had sojourned there for about three weeks when her husband died in Chicago on September 4, 1951. On the 19th of September, appellant became special administrator of the decedent's estate. The will executed under date of June 29, 1951, in which appellant and respondent were named as residuary legatees and devisees of the estate in the proportion of three-fourths and one-fourth thereof, respectively, was admitted to probate on October 16, 1951, and letters testamentary were issued to appellant as executor.

The course of the ensuing proceedings, extracting only those here germane, is best delineated in their chronological sequence:

*April 3, 1952*: Respondent filed a contingent creditor's claim against decedent's estate.[5]

*May 12, 1952*: Appellant filed an inventory and appraisement of the estate. Three supplementary inventories and appraisements were filed thereafter, the last on March 11, 1953. As of March 13, 1953, the total net assets of the estate were close to $500,000.

---

[4]This section commits decedent to pay $2,500 to Mr. Giesler as attorney's fees for services rendered to respondent upon the effective date of the agreement.

[5]Said claim reads in part: ''In the event that it should be ultimately adjudged that the Claimant is not entitled to take under the Last Will and Testament of the decedent, as aforesaid, then Claimant demands the following sums of money:

''The sum of $22,500.00 as and for the payment required to be made to her under the provisions of paragraph '3' of said agreement so dated August 2, 1951.

''The sum of $2,500.00 in exoneration of her liability under the terms and provisions of paragraph '17(a)' of said agreement.''

*Jan. 16, 1953*: Appellant filed his First and Final Account and Report of Special Administrator and a First Account Current and Report of Executor. Respondent filed objections to these accounts on January 27th and February 9, 1953.

*Jan. 26, 1953*: Respondent filed a petition for citation for the removal of appellant as executor. The citation was issued commanding appellant to show cause why the letters testamentary should not be revoked and he should not be removed as executor. Concurrently, she filed a petition for Partial Distribution in the sum of $24,000. A citation was issued requiring the executor to show cause why the court should not make an order distributing the sum prayed for.

*Feb. 13, 1953*: Appellant filed answers to the petitions filed by respondent on January 26. In answering the petition for partial distribution, appellant alleged the existence of substantial encumbrances against certain real property belonging to the estate; as an affirmative defense, appellant asserted that respondent was estopped by her acceptance of the benefits of the property settlement agreement from taking under the will, and that by virtue of the terms of said agreement she had waived and relinquished her right to take under the will.

*March 11, 1953*: The several petitions filed by respondent, various petitions for attorney fees and extraordinary fees, and settlement of and objections to appellant's accounts as executor and administrator came on for hearing before Judge Condee. It was stipulated that the matters might be heard together and "that evidence competent in any of the matters may be received and at the end the court will sort it out and make a separate ruling in each matter." There was no stipulation that these matters might be consolidated nor was any order made that they be consolidated. Thereafter, Judge Condee stated that his initial concern was with regard to appellant's competency to continue as executor. The hearing was continued to March 13th.

*March 13, 1953*: Upon resumption of the hearing, Mr. Lavine, present counsel for appellant, appeared and requested that he be substituted as counsel of record. Judge Condee consented only that he appear specially, on a phase of the removal proceedings. At the conclusion of this proceeding, Judge Condee made an order removing appellant as executor.[6] This order was reversed upon appeal in *Estate of Buchman,*

---

[6]The Citizens National Trust and Savings Bank was thereupon appointed special administrator with general powers.

123 Cal.App.2d 546 [267 P.2d 73], the court holding that the removal was accomplished in violation of appellant's constitutional right of due process, in that he had not been given specific notice of the charges against him or an opportunity to be fairly heard thereon.

*April 2, 1953*: Appellant filed a substitution of attorneys. Concomitantly therewith, he filed a petition to determine heirship,[7] with a prayer that the issues be tried by jury. Hearing thereon was set for April 23d. A formal demand for a jury trial in connection with this petition was filed on April 7th.

*April 6, 1953*: Appellant filed objections to the hearing of the petition for partial distribution by Judge Condee, alleging Judge Condee to be biased and prejudiced against him, and objecting to the hearing of any matters relating to the estate of decedent by said judge. In accordance with section 170 of the Code of Civil Procedure, appellant submitted his affidavit of bias and prejudice. Thereupon, Judge Condee continued all the various matters before him to May 18, 1953.

*April 8, 1953*: Judge Condee filed an affidavit in response to the motion to disqualify him. The judge controverted the statements in appellant's affidavit, denied "that by reason of any bias or prejudice Mr. Buchman cannot have a fair and impartial trial" before him and averred that in removing appellant as executor he was motivated only by the desire to preserve the estate.

*April 23, 1953*: Presiding Judge Philip H. Richards, having been duly charged with the determination of the issue of Judge Condee's asserted disqualification, filed his order and finding that the said judge was not disqualified to hear the pending matters.

*May 14, 1953*: Judge Victor R. Hansen made the following orders with respect to certain of the various motions relating to appellant's petition to determine heirship (see footnote 7, *supra*) : (a) overruled appellant's objections to the motion of respondent to vacate the setting of said petition; (b) denied

---

[7]As an outgrowth of this petition, a series of motions was filed by both sides. On April 10, 1953, respondent filed a motion to vacate the setting of this petition. On April 20, appellant filed a motion to strike respondent's motion to vacate the setting, and his objections thereto. On May 1, 1953, respondent filed a motion to abate and dismiss appellant's petition to determine heirship. Thereupon, appellant filed a motion to consolidate his petition to determine heirship with the petition for partial distribution previously filed by respondent. The rulings on these motions are given under date of May 14, 1953, *infra*.

appellant's motion to consolidate the petition for partial distribution with the petition to determine heirship;[8] (c) granted respondent's motion to vacate the setting of appellant's petition to determine heirship and ordered said petition "off calendar."

On this date, appellant filed a motion to be relieved from waiver of jury trial in the partial distribution proceeding.

*May 18, 1953*: The proceedings which had been initiated on March 11th, and which had been continued on April 6th, were resumed before Judge Condee. Appellant's motion to be relieved from waiver of jury trial was denied. The matters then were tried before the court.

*June 8, 1953*: Appellant filed a "Supplemental to First and Final Account and Report of Executor." Respondent filed her objections thereto on June 11th.

*Sept. 29, 1953*: The court entered its order settling the several accounts previously filed.

*Nov. 23, 1953*: The court filed its decree granting respondent's petition for partial distribution in the sum of $24,000.

Appellant has filed briefs totaling almost 250 pages, raising many issues and prolix in his citation of authorities. Succinctly stated, the paramount question is whether the property settlement agreement effectively precludes respondent from taking the testamentary dispositions in her favor under decedent's will. Appellant asserts that by virtue of the agreement, respondent relinquished her right to claim any part of the estate which decedent might leave to her by will. By its express terms, the agreement categorically declares that it shall be of no force and effect until approved by a court in divorce proceedings. (See paragraphs 16, 17(b) and 18, *supra*.) Despite the nonoccurrence of this condition precedent, appellant argues, in miscellaneous variations on the theme, that respondent is nonetheless bound by this agreement. In support of this thesis, he contends respondent is bound because she never rescinded the agreement, because she never restored or offered to restore the money and property she received under it, that she is thereby estopped from denying the agreement became effective upon its execution, and finally, that paragraphs 16 and 18 were dispensed with by death, and, in any event, should be disregarded. Respondent's brief has cogently met and effectively demolished the premises on which

---

[8]The court also denied appellant's motion to strike respondent's notice of motion to vacate the setting of the petition to determine heirship.

these arguments are predicated. However, it is here unnecessary that we engage in any extended inquiry into these issues, for even if we concede, *arguendo*, that the contract became binding upon the parties, appellant still cannot prevail on this phase of his case. For a textual examination of that document discloses that, under the controlling authorities, respondent is not foreclosed thereby from taking by bequest or devise under decedent's will.

The rule has become firmly crystallized in this state, by an unbroken concatenation of decisions, that unless a property settlement agreement expressly renounces the right to take by will, or the intention to accomplish such result appears by necessary implication, the agreement will not preclude the surviving spouse from taking what the decedent might choose to bequeath or devise. (*Estate of Crane*, 6 Cal.2d 218, 220-221 [57 P.2d 476, 104 A.L.R. 1011]; *Estate of Bartolo*, 124 Cal.App.2d 727, 728, 730 [269 P.2d 30]; *Estate of Hadsell*, 120 Cal.App.2d 270, 272 [260 P.2d 1021]; *Estate of Johnson*, 31 Cal.App.2d 251, 258 [87 P.2d 900]; *Nichols* v. *Board of Retirement*, 121 Cal.App.2d 176, 180 [262 P.2d 862]. See *Grimm* v. *Grimm*, 26 Cal.2d 173, 176, 177 [157 P.2d 841]; *Bennett* v. *Forrest*, 24 Cal.2d 485, 493 [150 P.2d 416]; *Shaw* v. *Board of Administration*, 109 Cal.App.2d 770, 776 [241 P.2d 635].) The definitive expression of this principle appears in the leading case of *Estate of Crane, supra*, which has been followed in many other jurisdictions.[9] In that case, the property settlement agreement contained the following language:

". . . 'It is further expressly covenanted and agreed that neither of the parties hereto will in any way or manner contest or oppose the probate of the other's will, whether heretofore or hereafter made, or interfere with the other, his or her heirs, or assigns, in the exercise of the rights of property herein agreed to; that neither of them will at any time hereafter assert any right, interest or title as heirs at law of the other *or as against the estate of the other, and all claim or right as surviving husband or wife, and all right to contest or oppose the last will of the other is hereby expressly waived*, together with all right to administer, or to apply for letters of administration, or *letters of administration with*

---

[9]*Berg* v. *Berg*, 201 Minn. 179 [275 N.W. 836]; *Bartle* v. *Bartle*, 121 Colo. 388 [216 P.2d 649]; *Swann* v. *Swann*, 131 W.Va. 555 [48 S.E.2d 425]; *First Nat. Bank of Princeton* v. *Miley*, 3 N.J. Super. 348 [65 A. 2d 553]; *In re Darrow's Estate*, 164 Pa.Super. 25 [63 A.2d 458].

*the will annexed,* upon the estate of the other . . . *It is the true intent and purpose of this agreement that the parties hereto have settled and forever adjusted, and that they do hereby·settle and forever adjust, by and between themselves, all present and future property rights of every kind and nature, whether community or separate, wheresoever the same is or may be located and all other rights and claims which either may have or claim to have against the other,* so far as their property rights are concerned, and in addition thereto that the said parties hereto have settled and adjusted, and do *hereby settle and adjust, and forever determine, all of their respective rights, to, of and in any inheritance the one from the other, respectively, or in or to the estate of either.' "* (Emphasis added.)

In deciding that the surviving widow was entitled to a bequest under her deceased husband's will, our Supreme Court stated (pp. 220-221): ". . . In this case the parties by the terms of their agreement did make reference and contract with relation to the will or wills of both or either of them, whether then existing or thereafter to be made. But the agreement in relation to such wills was not unlimited. The agreement of each party was, first, not to oppose the probate of the other's will; second, not to contest or oppose such will; and third, not to apply for letters of administration or letters of administration with the will annexed upon the estate of the other. Both parties agreed that by said contract they had settled, adjusted and forever determined 'all of their respective rights to, of and in any inheritance of the one from the other, respectively, or in or to the estate of either.' Reading the terms of the contract as thus limited, it took away from appellant all right or claim to any interest in the property of her husband either by virtue of her status as wife or widow or as heir of her husband. *But, as if by intention, there is a total failure to set forth in the contract any renunciation of the right to accept and receive future gifts to the one from the other whether by way of gift inter vivos, by devise, or by request.* As applied to such gift we find in the agreement no basis for an estoppel against appellant with respect to the legacy claimed in the will. . . ." (Emphasis added.)

In *Grimm* v. *Grimm, supra,* the court had occasion to give more elaborate expression to the rule of the Crane case. The question there presented was whether the property settlement agreement negated the wife's right to take the proceeds from

her husband's life insurance policy, in which she had been designated the beneficiary. In holding that the wife could take as a beneficiary, the court stated (pp. 176-177): "It is settled, however, that a contract constitutes an equitable assignment or renunciation of an expectancy only if it expressly or by necessary implication so provides. [Citation.] In interpreting property settlement agreements courts weigh carefully the language of the agreements before concluding that they eliminate rights the disavowal of which is not necessarily connected with the purpose of such agreements. [Citations.] This court and other courts have therefore applied to property settlement agreements the rule that *general expressions or clauses in such agreements are not to be construed as including an assignment or renunciation of expectancies* and that a beneficiary therefore retains his status under an insurance policy or under a will if it does not clearly appear from the agreement that in addition to the segregation of the property of the spouses it was intended to deprive either spouse of the right to take property under a will or an insurance contract of the other. [Citations.] In *Estate of Crane, supra,* this court set forth the considerations that commend the rule that *expectancies under a will or an insurance policy are regarded as waived only when it appears that the attention of the parties was directed to such expectancies and their intention to disclaim future rights that might develop from such expectancies was made clear in the contract.* Since the husband has the power to revoke his will or to change the beneficiary named in an insurance policy his failure to do so ordinarily indicates that he did not wish to effect a change so that in effect his failure to act amounts to a confirmation of the will or the designation of the wife in the insurance policy. Both instruments are to be read as expressing the decedent's intentions at the time of his death." (Emphasis added.)

In *Estate of Hadsell,* 120 Cal.App.2d 270 [260 P.2d 1021], the decedent willed all her property to her husband. After the execution of the will, decedent entered into a property settlement agreement with her husband which read in part: "It is agreed that neither party will at any time hereafter assert any right, title or interest as heir-at-law, or otherwise of the other to any property devised or bequeathed by such will, or as against the estate of the other, should the other die intestate, and all claims as such heir, or as surviving husband and wife respectively, and the right to contest or

oppose the will of the other is hereby expressly waived, together with the right to administer, or to apply for Letters of Administration, or Letters Testamentary, upon the estate of the other. The parties also waive all rights of probate, homestead and family allowance.'' The parties were living apart when the wife died. Both the husband and decedent's brother applied for letters testamentary. The brother was appointed administrator with the will annexed and the husband appealed. In reversing, the court stated (p. 272): ''Unless a property settlement agreement specifically renounces the right, such agreement does not estop a surviving husband or wife to take under the will of the other. And the will speaks from and as of the date of the testator's death. [Citation.] A property settlement agreement by a wife, relinquishing all right to any interest in her husband's estate, was not inconsistent with the husband's will, executed before the agreement, leaving his property to her. 'The relinquishment amounts to nothing more than leaving the decedent free to dispose of his property as he pleases. . . .' [Citation.]''

It is to be borne in mind that decedent executed the will under which respondent is claiming on June 29, 1951, while negotiations for a property settlement were in progress. He had then available an alternate form of will under which respondent would take nothing. This form he never executed. After the property settlement agreement was signed, he did not revoke the testamentary disposition in respondent's favor.

Applying the above criteria to the instant case leads inevitably to the conclusion that the trial court correctly interpreted the instrument as not extinguishing respondent's right to take anything the testator might voluntarily leave her by will. The agreement is comprehensive as to the existing property rights of the parties, and plainly preserves to each complete freedom with respect to the disposition of the segregated property. The crucial paragraphs are 5(e), 6, 7, and 8, set out *supra*. Their ultimate effect is to eliminate the future obligations of the testator growing out of the conjugal relationship; but in no way do they inhibit his privilege of making respondent an object of his testamentary bounty or abridge her eligibility to receive such gift. The contract does disclose, on the part of each, a relinquishment of the right (1) to act as personal representative of the other's estate; (2) to have set aside any of the other's property as community property or to declare a homestead thereon; (3) to demand

a family allowance, and (4) to *succeed* to the estate of the other. It specifically relates to a particular expectancy in paragraph 5(e), where respondent purports to surrender any right or claim as a beneficiary of decedent's insurance policies, which are individually listed in an appendix. But one searches in vain for any provision in which respondent agreed to forego any part of the estate that might come to her *by will*. In *Estate of McNutt*, 36 Cal.App.2d 542, 549 [98 P.2d 253], decided by this court, it was said: ''If it had been the intention of the parties that plaintiff should waive her right to inherit from decedent, under such circumstances as those presented, 'the easiest and most natural thing in the world would have been for them to have simply, plainly and in apt language said so.' ''

Appellant urges that particular language in paragraph 7, when construed with the other paragraphs alluded to, must necessarily exclude the respondent from inheriting by will. He focuses his emphasis on the clause appearing near the close of the paragraph, following the recitation of various express waivers, which reads ''or any other right, benefit or emolument from the estate of the other'' as the fulcrum for this argument. However, the tenor of the authorities we have previously cited, militates fatally against appellant's construction. ■ For it is firmly established that general expressions or clauses are not to be construed as a relinquishment or divestment of an expectancy to take by will unless that is the clear and unmistakable import of the language employed. (*Grimm* v. *Grimm*, 26 Cal.2d 173, and cases cited at pages 176 and 177 [157 P.2d 841].) ■ As the Grimm case states in exposition of this rule, ''expectancies under a will . . . are regarded as waived only when it appears that the attention of the parties was directed to such expectancies and their intention to disclaim future rights that might develop from such expectancies was made clear in the contract.'' But there is nothing in the record to remotely suggest that respondent ever knew that decedent had included her in the testamentary scheme of his will, or that her attention was directed to such possibility. The agreement contains no express reference to such expectancy, and it does not show with any quantum of reasonable certitude that respondent was, by necessary implication, waiving her right to take by will. The general language relied on by appellant does not express such intent with the certainty the law requires for the renunciation of an expectancy. Furthermore,

it may be observed that they are set in immediate juxtaposition with and colored by the waiver of family allowance in the preceding clause and the waiver of the right to select a homestead in the succeeding one, and are contained in the same paragraph where the right of succession to, as well as the right to act as personal representative of, the estate is waived. The agreement was prepared by able and experienced counsel presumably conversant with the law, and if it had been intended that respondent waive the right to inherit by will the insertion of a few simple words could have easily effected such result.[10] (*Estate of McNutt*, 36 Cal.App.2d 542, 549 [98 P.2d 253].) However, such words are here entirely absent, and we may not undertake, by indulging in precarious and dubious inferences, to supply them and thus remake the contract of the parties. The observation of the court in *Estate of Crane,* supra, (p. 220) is here apposite that "as if by intention, there is a total failure to set forth in the contract any renunciation of the right to accept and receive future gifts to the one from the other whether by way of gift *inter vivos*, by devise, or by bequest." We are all the more restrained from interpolating such words because a scrutiny of the text of paragraph 8 reveals with what specificity of detail the desired releases of various rights is set forth. This paragraph, read in conjunction with paragraph 5(e), containing the waiver of rights under the insurance policies, points up how cognizant the draftsmen of the contract were of the necessity to embody therein the release of expectancies. It is noteworthy that the parties waived the right "to succeed to the estate of the other," i.e., to take by descent—by operation of law (*Estate of Schwartz*, 79 Cal.App.2d 301, 307 [179 P.2d 863]), yet significantly omitted any reference to an expectancy under a will. Taking into account the meticulously defined waiver of rights and releases of expectancies enumerated in the document, the situation presented renders peculiarly applicable the invocation of the maxim *expressio unius est exclusio alterius*. In *Estate of Minier*, 215 Cal. 31, the court stated in discussing a kindred problem (p. 35 [8 P.2d 123, 81 A.L.R. 689]) : "It will be further observed that following .the gen-

---

[10]In *Sullivan* v. *Union Oil Co. of Calif.*, 16 Cal.2d 229 [105 P.2d 922], the agreement provided that the parties "release and waive all right to inherit under any will of the other." (P. 233.) This exact phrase is used in the agreement considered in *Meherin* v. *Meherin*, 99 Cal.App.2d 596, 598 [222 P.2d 305].

eral release clause in the separation agreement between Mr. and Mrs. Minier is a provision that in case of divorce neither party will make any claim or demand from the other for any cost, counsel fees, or alimony, or any other property claim, or demand of any kind whatsoever. That the parties should so carefully and minutely provide against either party claiming any rights from the other in case of divorce proceedings being instituted and should omit any reference to any claim either should make against the property of the other in the case of the death of either, under the rule of *expressio unius est exclusio alterius,* leads strongly to the inference that they did not intend by their agreement to relinquish or in any way affect their inheritable rights."

In the light of these circumstances, to hold that a contract by necessary implication was intended to nullify an antecedent will in the possession of, and subject to the absolute control of its maker, where the proper construction of its language does not so require, would be to incorporate therein a specific term which the parties have not included. To do so would constitute an unwarranted departure from the principles governing cases of this character. (*Grimm* v. *Grimm, supra; Estate of McNutt, supra; Estate of Minier, supra; Estate of Jones,* 118 Cal. 499, 502 [50 P. 766, 62 Am.St.Rep. 251].)

The principal cases relied on by appellant are clearly distinguishable, and reinforce the views here expressed. In *Sullivan* v. *Union Oil Co. of Calif.,* 16 Cal.2d 229 [105 P.2d 922], the husband had an interest in an "Employees' Provident Fund" maintained by his employer, to which he contributed by monthly deductions from his salary, and which provided for a benefit payable at death to the wife. This "Provident Fund" was *expressly mentioned* in a property settlement between husband and wife dividing all their property. As pointed out in *Grimm* v. *Grimm, supra,* (p. 180) in distinguishing the case: "Under the facts of that case all interests of the wife in the fund were regarded as part of her interest in the community property and as such released [by the agreement] in favor of the husband." In *Meherin* v. *Meherin,* 99 Cal.App.2d 596 [222 P.2d 305], a husband and wife made a property settlement agreement in which the wife released to her husband her interest in a certain policy which was *specifically designated* in the instrument. It was therefore held her rights terminated even though the husband had not executed a formal change of beneficiary

before his death. In *Thorp* v. *Randazzo,* 41 Cal.2d 770 [264 P.2d 38], the court was again confronted with a property settlement agreement in which a divorced wife (plaintiff) waived her claims in two named and numbered insurance policies on her husband's life. The deceased failed to remove plaintiff's name as beneficiary of one of the policies, although he did on the other. In rejecting plaintiff's claim to the proceeds of the policy, the Supreme Court reaffirmed the rules we have hitherto stated (see pp. 773-774). The court then said (p. 776) : ''Expectancies under a will or an insurance policy may be regarded as waived only when it appears that the attention of the parties was directed to such expectancies and their intention to disclaim future rights which might develop from such expectancies is made clear in their property settlement agreement. [Citations.] But in the present case *specific reference was made in the agreement to the insurance policy, and plaintiff expressly waived all claim to 'any benefits that she may have at present or which may hereafter be derived from' such policy.* This language clearly indicates that the parties' attention had been directed to the expectancy of the insurance proceeds, and that it was intended that plaintiff waive all interest therein, present and future.'' (Emphasis added.)

This is vitally different from the agreement here under consideration and lends support to our conclusion that plaintiff is not barred from taking under the will.

In view of this conclusion, it becomes readily apparent that there is no substance in the affirmative defense of waiver by agreement interposed to the petition for partial distribution. The further argument that respondent is estopped to deny the binding force of the agreement is of no moment since such agreement offers no obstacle to her right to take under decedent's will.[11]

There is likewise no merit in the claim of error in several rulings on the admission of evidence. To begin with, the court did receive evidence, contrary to appellant's claim, of the length of the marriage, the fact that difficulties had arisen, and that respondent was advised by counsel in negotiating the property settlement agreement. The exclusion

[11]The claimed error committed by the trial court in allegedly failing to find on the question of estoppel is rendered immaterial. (*Logan* v. *Forster,* 114 Cal.App.2d 587 [250 P.2d 730].) Therefore the exclusion of certain evidence touching on the question of estoppel is, of course, nonprejudicial.

of other evidence relating to the purpose of respondent's trip to Nevada after the agreement was executed and her remarriage after her husband's death was not prejudicial. It could not affect the terms of the previously negotiated property settlement agreement and was not calculated to establish that her attention was directed to any possible expectancy and that she waived it. On this latter point, the court excluded no competent evidence.

Appellant also seeks review of the order vacating the setting of his petition to determine heirship, contending he was thereby denied a trial by jury to which he was entitled by section 1081 of the Probate Code. He also assigns as error the court's ruling in denying his motion to be relieved from waiver of a jury trial in the hearing of respondent's petition for partial distribution. In brief recapitulation of the events leading up to these rulings, respondent filed her petition for partial distribution on January 26, 1953. Appellant filed his answer thereto on February 13, 1953. By way of affirmative defense, appellant set up the property settlement agreement, alleging that thereby respondent was not entitled to take under the will and was estopped to disclaim the validity of the agreement by virtue of having allegedly accepted its benefits. This petition was first set for hearing on February 13, 1953, but was continued from time to time until March 10, 1953, when it was transferred with the other pending matters, for determination by Judge Condee. The various matters were continued until the following day, when the parties entered into the stipulation concerning the mode of conducting the hearing and the application of the evidence to all of the pending matters. When the court thereafter concerned itself with the question of appellant's competency to act as executor, the other proceedings were continued until April 6th. On April 2, 1953, appellant filed his petition to determine heirship and prayed for jury trial. This was 65 days after service of citation on him of respondent's petition for partial distribution, 48 days after the matter was first set for trial, and about three weeks after the hearing had commenced and stipulations made as to the conduct of the proceedings.

We may pause here to point out that the petition for partial distribution and the answer thereto embraced all the issues involved in the heirship proceeding. ■ A petition for partial distribution implements the policy of the law favoring the earliest possible delivery of inherited property to legatees

or devisees consistent with a proper administration of the estate. (*Estate of Glenn,* 153 Cal. 77, 80 [94 P. 230] ; *Estate of Morelli,* 102 Cal.App.2d 39, 42 [226 P.2d 716].) Diverse questions are often raised in such a proceeding in addition to the propriety of distribution, including that of disputed heirship. (*Estate of Painter,* 115 Cal. 635, 639-640 [47 P. 700] ; *Estate of Hill,* 94 Cal.App. 113, 117 [270 P. 708].)

■ As stated in *Estate of Hill:* "before the court can make an order for partial distribution, it is necessary to know whether the petitioner is entitled to any part of the estate. (*Estate of Ross,* 187 Cal. 454, 466 [202 P. 641].)" To the same effect is *Estate of Stephenson,* 65 Cal.App.2d 120, 124 [150 P.2d 222].

■ In proceedings for partial distribution, either party has a right to demand a trial by jury of any issues of fact raised therein. (*Estate of Baird,* 173 Cal. 617, 623 [160 P. 1078] ; *Estate of Perkins,* 21 Cal.2d 561, 567 [134 P.2d 231]. From the record, it is clear that appellant's former counsel waived any right to a trial by jury by failing to demand a jury "at the time the cause is first set upon the trial calendar if it be set upon notice or stipulation, or within five days after notice of setting if it be set without notice or stipulation . . ." (Code Civ. Proc., § 631, subd. (4) ; *Estate of Henshaw,* 68 Cal.App.2d 627, 638 [157 P.2d 390] ; *Glogau* v. *Hagan,* 107 Cal.App.2d 313, 316-319 [237 P.2d 329].)

■ As late as March 11th, the record is clear that appellant was prepared to proceed without a jury and that this waiver of jury had been consciously and deliberately effected. The belated interjection of appellant's petition to determine heirship coupled with a demand for a jury trial (Prob. Code, §§ 1080-1081) did not compel a suspension of the proceedings and a trial of the matter by jury thereafter. (*Estate of Stephenson,* 65 Cal.App.2d 120, 124 [150 P.2d 222].) When the motion to vacate the setting of this petition was before Judge Hansen on May 14, 1953, the following situation prevailed : The partial distribution proceeding was set for further hearing four days later; the petition to determine heirship, filed some two months after service of respondent's petition for partial distribution, constituted a duplication of the issues already before the court in the distribution proceeding and a jury had been deliberately waived in the latter proceeding by appellant. We perceive no abuse of discretion on the part of Judge Hansen, in the light of these facts, in vacating the setting and ordering the petition "off calendar."

The denial of appellant's request for relief from the waiver of the jury trial was likewise proper. (*Estate of Stephenson, supra.*) The request for such relief was filed on May 14th and the order of denial was made upon the resumption of the hearing of the partial distribution and other proceedings on May 18th. *Estate of Stephenson, supra,* bears a striking parallel to the instant situation. In that case, the court refused to suspend its hearing of a petition for partial distribution despite the filing of a petition to determine heirship accompanied by a demand for a jury trial on the day set for hearing on the first petition. The court remarked in language here pertinent: "As above noted at the commencement of the hearing on respondent's petition no proceedings to determine heirship were pending. The filing of the heirship proceedings during the progress of the hearing did not compel the court to terminate the hearing and decide the issues then before the court at a later hearing on appellant's heirship petition. All of the interested parties were then before the court and the issues were clearly set forth. Appellant had had notice of the pendency of the respondent's petition and was not prejudiced by the action of the court in proceeding therewith. Appellant's claim that she was prejudiced by being deprived of a jury trial is without merit. She made no demand for a jury trial in the matter heard by the court. Her only demand for a jury trial was made at the time she filed her own petition to determine heirship and, as we have seen, the court was justified in proceeding with the hearing of the issues on respondent's petition for partial distribution."

Furthermore, appellant was not prejudiced in this instant situation by proceeding without a jury. The question here involved is one of law, viz., the interpretation of an unambiguous written property settlement agreement. As has been pointed out previously where, as here, there is no evidence to indicate that the attention of the respondent was directed to an expectancy under a will and no clear language appears in the settlement contract suggestive of an intention to disclaim such an expectancy, the agreement will not be construed as a renunciation of the right to take under the will. (*Crane* v. *Crane, supra*; *Grimm* v. *Grimm, supra*; *Thorp* v. *Randazzo, supra.*) In such case, it is the duty of the court to carry out the solemn directions contained in the will without detracting from the provisions therein made.

Appellant charges that he was denied due process on the theory that the trial judge's conduct was arbitrary and

capricious. He therefore asserts that the entire proceedings herein were "null and void." He bases this contention on the fact that on March 11, 1953, when the petition of Mrs. Morse for partial distribution, petitions for attorney fees, and extraordinary fees, and the settlement of and objection to the accounts of the administrator and executor came on for hearing, the court, on its own motion, raised the question of the competency of appellant to act as executor, and two days later removed him from this office. This order was reversed because of the lack of prior notice of the specific charges against him and the failure to provide him an opportunity to present evidence in his defense. (*Estate of Buchman,* 123 Cal.App.2d 546 [267 P.2d 73].) In holding appellant was denied due process of law (p. 561) in this removal proceeding the court pointed out that the judge's conception of his duty was erroneous (p. 560). On April 6, 1953, the date to which the matters here under review were continued, appellant, through new counsel, filed objections to Judge Condee's hearing the petition for partial distribution or any other matter in the Buchman Estate on the ground that Judge Condee "is biased and prejudiced" against him. Appellant supported his objections by his own affidavit in accordance with section 170, Code of Civil Procedure. Judge Condee thereupon continued the various matters, including the petition for partial distribution, to May 18, 1953. In the meantime Judge Condee filed his controverting affidavit and answer in response to the motion to disqualify. The matter was referred to the Honorable Philip H. Richards, Presiding Judge of the Superior Court of Los Angeles County, to pass upon. On April 23d he found that Judge Condee was not disqualified. Notwithstanding Judge Richards' decision, appellant asserts that the reversal of the order removing him as executor of the estate necessarily meant that Judge Condee was in fact biased and prejudiced and that on review of "the judgment of the balance of the proceedings of this consolidated trial, it must necessarily follow that the entire proceedings were fatally infected with the denial of due process" which nullified all subsequent orders. In making this argument appellant misconceives his legal position in three particulars. The first relates to the decision of the District Court of Appeal in the removal proceeding (*Estate of Buchman, supra.*) The basis of the reversal of the order removing Buchman as executor was the failure to give him prior notice of the asserted grounds therefor and an opportunity to present

evidence in relation thereto. This, of course, was a denial of due process but it was not a determination that Judge Condee was guilty of bias and prejudice. As the court pointed out (p. 560), the judge's conception of his duty was simply erroneous. ▮ However, an erroneous opinion on the law relating to proceedings is not "any evidence of bias or prejudice." (*Ryan* v. *Welte,* 87 Cal.App.2d 888, 893 [198 P.2d 351].) ▮ Likewise, "the expressions of opinion uttered by a judge, in what he conceives to be a discharge of his official duties, are not evidence of bias or prejudice." (*Kreling* v. *Superior Court,* 25 Cal.2d 305, 310-311 [153 P.2d 734].) Appellant's second misconception relates to the effect of Judge Richards' decision on appellant's charge of bias and prejudice against him. ▮ The burden in such proceedings was on appellant to establish as a fact that Judge Condee was biased or prejudiced against him. (*Golish* v. *Feinstein,* 123 Cal.App. 547, 549 [11 P.2d 893] ; *Ryan* v. *Welte, supra.*) On conflicting evidence Judge Richards found that appellant's charges were not true. ▮ A finding and order based on such evidence is, of course, binding on appeal. (*Barry* v. *Contractors State License Board,* 85 Cal.App.2d 600, 608 [193 P.2d 979] ; *Ryan* v. *Welte, supra,* p. 891.) This provides a complete answer to appellant's further point that "the trial court erred in failing to grant a change of venue in this case to some other judge." Since the matters were regularly before a judge who was not disqualified there was no legal reason for a transfer to another court. Appellant's third misconception relates to the state of the record. ▮ It is his position that all matters before the probate court in the Buchman Estate were consolidated. From this he argues that the lack of due process inherent in the removal proceeding permeated the entire matter, vitiated all orders thereafter made, and rendered them null and void. The fact is, the several matters before the probate court were not consolidated except for convenience of trial of related issues. On March 11, 1953, counsel for the parties stipulated, with the court's approval, "that these [matters] may all be tried together, and that evidence competent in any of these matters may be received, and at the end the court will sort it out and make a separate ruling in each matter." No order of consolidation was made. As indicated by the stipulation, a single order or judgment was not contemplated as is true where there is actual consolidation. (See *McClure* v. *Donovan,* 33 Cal.2d 717, 721-722 [205 P.2d 17].)

It is thus clear that while all of the matters were related, since they all pertained to some phase of the Buchman Estate, they were each to be decided individually and separately based upon the evidence relevant to the particular item. Hence the failure to observe procedural due process in the removal proceedings of March 11 and 13 could not possibly serve to render invalid orders thereafter made relative to partial distribution, settlement of accounts or allowance of fees.

In this connection appellant makes the further contention that "having appointed a special administrator, the court was without power to make a partial distribution." In making this contention appellant fails to appreciate that the special administrator was appointed "with general powers" pursuant to section 465, Probate Code.[12] ▮▮▮ As said in *Levy* v. *Cytron,* 84 Cal.App.2d 827, 829 [191 P.2d 816]: "The plain language of the . . . section leaves no room for construction. Its obvious purpose is to provide a general administration of the estate during the delay and uncertainty attendant upon a will contest or litigation over the appointment, suspension or removal of an executor or administrator. The order granting the special administratrix the additional powers authorized under section 465 of the Probate Code in effect made her letters general rather than special. [Citation.] Having all the powers of a general administratrix, she had the power to sell property of the estate."

▮▮▮ Since general administration is provided for by such an appointment, the probate court clearly had jurisdiction to determine a previously filed petition for partial distribution. The cases relied on by appellant are not helpful since they did not involve special administrators with general powers appointed pending an appeal from an order removing an executor. Indeed, it is pointed out in *Estate of Davis,* 175 Cal. 198 [165 P. 525] (on which appellant relies), in explaining the holding in *In re Welch,* 106 Cal. 427 [39 P. 805] (on which appellant also relies) that: ". . . the court had no authority, while there was a special administrator in charge of the estate *and during the time when the general administration was suspended,* to make a partial distribution." (Empha-

---

[12]The pertinent portion of section 465 reads:
"When a special administrator is appointed . . . pending an appeal from an order appointing, suspending or removing an executor or administrator, the special administrator shall have the same powers, duties and obligations as a general administrator and the letters of administration issued to him shall recite that such special administrator is appointed with the powers of a general administrator. . . ."

sis added.) Thus the deficiency pointed out in the Welch case, viz., the absence of general administration, was supplied in the instant matter by clothing the special administrator with general powers pursuant to the authority of Probate Code, section 465.

These conclusions effectively dispose of appellant's next contention that "the notice of appeal from a consolidated trial, in which part is reviewable on appeal, removes the jurisdiction of the superior court and the trial judge should have therefore stayed all of the proceedings until after the decision on appeal." This proposition is not here applicable because, as above pointed out, the several matters were to be separately and individually decided on the evidence relevant to each. Hence an appeal from the removal order could not possibly serve to deprive the superior court of jurisdiction to consider the petition for partial distribution while the appeal from the former order was pending. (Code Civ. Proc., § 946; 3 Cal. Jur.2d 682, § 193. See also *Estate of Thayer*, 1 Cal.App. 104, 106 [81 P. 658].) Appellant's error lies in his mistaken belief that all the proceedings before the probate court were truly consolidated. As disclosed by the record, such is not the fact. Hence his asserted proposition is wholly without any appropriate factual foundation. Appellant relies on *Evans v. Superior Court*, 107 Cal.App. 372 [290 P. 662]. Examination of that case, however, discloses that it does not support his proposition.

Appellant argues that the court erred in ordering partial distribution to petitioner on the ground that "The Estate was not in such a shape as to permit the partial distribution at the time." Section 1001 of the Probate Code authorizes the court to order partial distribution if it appears that the estate "is but little indebted"; that the state has consented thereto in writing; and that the distribution may be made "without loss to the creditors or injury to the estate or any person interested therein." The section further provides that when the time for presenting claims has expired and "all uncontested claims have been paid or are sufficiently secured by mortgage or otherwise, and the court is satisfied that no injury can result to the estate, the court may dispense with the bond."

Whether an estate "is but little indebted" or partial distribution can be made "without loss to the creditors or injury to the estate or any person interested therein" are questions of fact to be determined by the trial court upon a comparison of the value of the estate with the amount of debts,

the character of the property, the expense of its maintenance and operation where it is a part of a business venture, the extent of the net income therefrom and all other relevant factors. (*Estate of Chesney,* 1 Cal.App. 30, 34 [81 P. 679]; *Estate of Hinkel,* 176 Cal. 563, 567 [169 P. 70]; *Estate of Morelli,* 102 Cal.App.2d 39, 42 [226 P.2d 716].) In the instant matter, the findings disclose that the estate had some $60,000 in cash at the date of the accounting; the value of the estate at that time was approximately half a million dollars; that the two parcels of improved real property were encumbered only to about 40 per cent and 25 per cent, respectively, of their value, and that the net income therefrom to the estate was some $3,000 per month; and further, that the unsecured debts and expenses of administration would not exceed $25,000. Appellant does not contend that the evidence does not support these findings. It is also to be noted that the time for filing creditors' claims had long passed and the State of California had consented to the distribution. In light of these facts it cannot be said, as a matter of law, that the trial court abused its discretion in ordering $24,000 distributed to respondent out of an estate of this magnitude, which was yielding a substantial monthly net income and was relatively little encumbered.

 Appellant further complains that no bond was required of respondent. However, the time for filing claims had passed. There was ample security left in the estate. In discussing the necessity of a bond in such circumstances it was pointed out in the Morelli case, *supra* (p. 42), that "The court must require a bond if the time for presentation of claims has not expired, but after that time it may dispense with the bond if there is sufficient security left in the estate." The facts herein recited justify the implied finding that "no injury" could result "to the estate" by dispensing with the bond. (Prob. Code, § 1001.) On this point we may say, as did the court in *Estate of Johnson,* 218 Cal. 501 [23 P.2d 1012], that "The question of a bond on partial distribution, under the facts here, was one of discretion and we see no showing of an abuse thereof." (P. 504.)

· As his final contention, appellant assigns as error the court's disposition of three items in connection with the settlement of accounts: (1) He complains of the order requiring him to reimburse the estate forthwith in the amount of $6,000 despite the fact that his fees as executor would exceed this amount. This determination was correct. It was conceded

that appellant owed this amount to decedent.[13] The order properly treated this indebtedness as cash in the hands of the executor for which appellant was chargeable in his accounting. (Prob. Code, § 602; *Estate of King,* 19 Cal.2d 354, 361 [121 P.2d 716]; *Manifie* v. *Rowley,* 187 Cal. 481, 486 [202 P. 673]; *Estate of Clary,* 203 Cal. 335 [264 P. 242]; *Estate of Jones,* 115 Cal.App. 664, 669 [2 P.2d 483].) (2) The record also shows that appellant was properly surcharged in the sum of $665. This sum was listed as a disbursement for a tombstone for decedent's father, which decedent had contracted to pay. However, the item appeared twice as a credit, apparently by mistake,[14] and the court adjusted the matter to avoid duplication. (3) The last item relates to the sum of $2,515, which appellant paid to a Chicago mortician as the cost of decedent's funeral. The record shows that there was no question as to the reasonableness of the amount, and that appellant testified he had paid the money therefor out of his personal assets. The transcript shows that the court stated: "The funeral expenses will be allowed." In its formal findings, the court found to be true paragraph XIII of appellant's first and final account and report and first account current and report, which alleges, in part, that appellant advanced $2,515 in personal funds to Furth and Coe, of Chicago, for the funeral expenses of the decedent. The order shows that the above named accounts were settled and allowed as rendered, except with respect to the surcharge of $6,000 and $665 which have been

---

[13]The transcript shows the following:

"MR. DEVOR: . . . there is no doubt he is indebted to the estate for $6,000.

"THE COURT: Yes, he would have to ask for instructions or otherwise if he claims it against the estate, and a debt of the executor or administrator becomes cash in his hands.

"You concede that is true?

"MR. LAVINE: Yes, your honor, I concede that. There is no question about that. We have some matters in connection with which we will take up with the special administrator, however.

"THE COURT: Yes. Well, it wouldn't preclude you later on showing the facts, whatever they are."

[14]The record discloses this colloquy:

"THE COURT: Well, then when you see it appearing in the corporation too it is probably a duplication, isn't it?

"MR. LAVINE: We are not asking for duplication, your Honor. The executor only wants it once, your Honor.

"THE COURT: Then that would be a $625 [sic] surcharge, on the double. Are you satisfied with that, Mr. Devor?

"MR. DEVOR: Yes, your Honor, we will allow him to have it once, but not twice.

"MR. LAVINE: We are agreeable. It was an error in bookkeeping there."

heretofore discussed. This indicated that the court did not disallow the sum of $2,515 for funeral expenses, but considered appellant to be entitled to credit therefor as prayed. Apparently by inadvertence, this item was not specifically included in the order. The order should accordingly be modified to credit appellant's account with this sum.

The order decreeing partial distribution is affirmed. The order settling accounts is modified to include the following: "Hamlin K. Buchman is hereby authorized to credit himself for funeral expenses disbursed by him personally the sum of $2,515.00" and, as so modified, the order is affirmed. The costs on appeal are apportioned as follows: Appellant 90 per cent and respondent Claire Morse 10 per cent.

Moore, P. J., and McComb, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 25, 1955. Carter, J., was of the opinion that the petition should be granted.