IRELAND'S LUMBER YARD, a foreign corporation, Plaintiff and Respondent,

v.

PROGRESSIVE CONTRACTORS, INC., a foreign corporation, Defendant,

and

Continental Casualty Company, a foreign corporation, Fidelity and Casualty Company of New York, a foreign corporation, Defendants and Appellants.

No. 8048.

Supreme Court of North Dakota.

June 14, 1963.

Rehearing Denied July 26, 1963.

Degnan, Hager, McElroy & Lamb, Grand Forks, for defendants and appellants.

Letnes & Hansen, Grand Forks, for plaintiff and respondent.

TEIGEN, Judge.

Plaintiff, Ireland's Lumber Yard, Inc., a materialman, instituted this suit against the prime contractor, Progressive Contractors, Inc., and its two payment and performance bond sureties for materials furnished. The bonds were executed to secure payment for all labor and materials furnished in the prosecution of the work covered by the principal contract calling for the construction of 744 housing units for military personnel at the United States Air Force Base at Grand Forks, North Dakota.

The complaint alleges the supplying of material to the prime contractor and some of its subcontractors and their failure to pay for them. The prime contractor, Progressive Contractors, failed to answer and judgment was entered against it by default. The sureties, Continental Casualty Company and Fidelity and Casualty Company of New York, answered. In their answer they admit construction contracts were entered into for the construction of the housing units, the execution of the payment and performance bonds and that the plaintiff gave the notices of claims. However, they placed the plaintiff on its proof as to the material supplied, the value thereof, the claim of nonpayment, and denied the other averments of the complaint.

Further answering the sureties allege the complaint does not state a cause of action. The defendant sureties also moved the court to dismiss the action for lack of jurisdiction.

It is undisputed that on or about August 1, 1958, Progressive Contractors, as prime contractor, entered into contracts with the Department of the Air Force and seven housing corporations for the construction of 744 housing units at the Grand Forks Air Base; that to secure the faithful performance of these contracts the prime contractor, as principal, and the defendant sureties executed 100% payment and performance bonds and delivered them to the seven housing corporations. These bonds were in the aggregate amount of over twelve million dollars.

The district court tried the case without a jury. It found in favor of the plaintiff and awarded judgment against the prime contractor and the defendant sureties in the amount of $9,723.03, plus interest at 4% per annum from May 21, 1960. The sureties have appealed and demand trial de novo.

The defendant sureties specify it was error for the court to hold it had jurisdiction as the project was a "public works" and jurisdiction was limited to the federal court pursuant to 40 U.S.C.A. §§ 270a and 270b (Miller Act); that the trial judge erred in failing to disqualify himself for having prematurely ruled in the case and, lastly, if the court had jurisdiction that it erred in holding the plaintiff was entitled

to recover the additional sum of $8,045.69 as it had failed to comply with the terms of the bond with respect to timeliness in giving notice of claim.

The situation presented arises as a result of the construction of housing for military personnel stationed at the Grand Forks Air Force Base at Grand Forks, North Dakota, under the housing program authorized by what is commonly known as the Capehart Housing Act, as amended, 42 U.S.C.A. § 1594. Its purposes and objects are succinctly stated in Continental Casualty Company v. United States, 8 Cir., 305 F.2d 794, as follows:

"The purpose of the Capehart Act was to provide urgently needed housing for military personnel on Government property, and while Capehart housing is undoubtedly 'Government housing,' Capehart construction differs from conventional Government construction in certain significant respects.

"Ordinarily, federal public works are paid for both initially and finally with federal funds. Capehart housing, on the other hand, initially is built and financed by private capital, although loans made by financial institutions to finance the construction are fully insured by the Federal Housing Administration. Both the Department of Defense and the Federal Housing Administration are concerned with the administration of the Capehart program, and the Federal Housing Commissioner has been authorized to promulgate regulations concerning the program, 12 U.S.C.A. § 1748f, which authority has been exercised, see 24 C.F.R. Part 292a.

"The Capehart Act now requires both payment and performance bonds, and standard forms of those bonds have been worked out by the Department of Defense and the Federal Housing Administration, and all Capehart housing contracts call for the giving of those particular bonds, as was done in this case.

"With some allowance for possible oversimplification, a typical Capehart project may be described substantially as follows:

"A building contractor desiring to build Capehart housing and who has been the successful bidder for such housing, and who has made satisfactory arrangements to secure private financing, forms a corporation to take a long term lease on the Government property on which the housing is to be constructed and to execute a mortgage on the leasehold estate to the financial institution which is to lend the money required for construction purposes. This corporation, which is at all times under complete Government control, does not do the actual building of the housing units. That is done by the contractor under contract with the Government and with the corporation. The functions of the corporation are limited and to some extent nominal. It takes the lease and executes the mortgage and is a party to the construction contract. Further, it is one of the obligees named in the contractor's performance and payment bonds. In the statute, regulations, and contract documents the contractor is called the 'eligible bidder,' the corporation is called the 'mortgagor-builder,' and the lending agency is called the 'mortgagee.'

"As the project is completed, the housing units are turned over to and operated by the Government and are occupied by military personnel. Quarters allowances previously paid to such personnel are retained by the Government and used to pay off the mortgage. When the mortgage is finally retired, the lease to the 'mortgagor-builder' is terminated, and that corporation is dissolved, leaving title to the housing in the Government.

"The contractor derives his profit from doing the actual building of the housing. From the Government's

standpoint, advantages are seen in that federal funds are not expended for initial construction and, while the housing will be paid for eventually with federal money, that money would have been expended in any event as quarters allowances for the affected service personnel. In addition, the program may be supposed to provide a stimulus for private industry and capital."

The bond in this suit was executed on a form specifically described by the contract for the construction of the housing, which form had been adopted by the Department of Defense and by the Federal Housing Commissioner. The bonds contained certain provisions for notice to be given by laborers or materialmen as a condition precedent to commencing action on the bond. It defines a claimant as "one having a direct contract with the Principal or with a subcontractor of the Principal who has furnished labor, material, or both, in the prosecution of the work provided for in the Contract and who has not been paid in full therefor." It is not disputed that Ireland's Lumber Yard is a claimant within the definition.

Paragraph 4(c) of the bond provides that no suit or action shall be commenced under the bond by any claimant "Other than in a State court of competent jurisdiction in and for the county or other political subdivision of the State in which the project, or any part thereof, is situated, or in the United States District Court for the district in which the project, or any part thereof, is situated and not elsewhere."

In attacking the jurisdiction of the state's district courts, it is the contention of the defendant sureties that the provision of the bond above quoted is not governing for the reason that the purpose of the bonding provisions in the Capehart Act, 42 U.S.C.A. § 1594, was merely to substitute it for the bond described in the Miller Act, 40 U.S. C.A. § 270b(b), and that the remaining provisions of the Miller Act apply to Capehart bonds just as they do to Miller Act bonds.

This, they argue, includes the provision of the Miller Act which confers exclusive jurisdiction on the district courts of the United States. The Miller Act provides:

"Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere, * * *."

It is argued that Section 270a (Miller Act) requires the giving of performance and payment bonds by contractors engaged in the construction, alteration, or repair of any "public building or public work of the United States" where the amount of the contract exceeds $2,000. The defendant sureties contend this section was made inoperative as to a Capehart housing project by the 1956 amendment to the Capehart Act, 42 U.S.C.A. § 1594, which provides that all contracts for Capehart housing "shall provide for the furnishing by the contractor of a performance bond and a payment bond with a surety or sureties satisfactory to the Secretary of Defense, or his designee, and the furnishing of such bonds shall be deemed a sufficient compliance with the provisions of section 270a of Title 40, and no additional bonds shall be required under such section." They contend, however, that Section 270b(b), which provides that every suit instituted under this section shall be brought by the United States for the use of the person suing in the United States District Court, is still operative and suit on a Capehart bond must be brought in the federal court.

It is the contention of the plaintiff that although the Capehart Act refers to Section 270a of Title 40 (Miller Act), nevertheless the Capehart Act bond is not a Miller Act bond and the Secretary of Defense, or his designee, had the power to prescribe the form and contents of a Capehart bond; that the form used was prescribed by and satisfactory to the Department of Defense; that the interpretation placed upon the

statute by the agency charged with its enforcement is entitled to great weight; that the provisions providing that suit may be brought in either the state court or the federal court was in fact inserted in the provisions of the bond and that liability of the surety may be determined under the provisions of the instrument which it actually signed, rather than by the terms of the Miller Act.

In support of their arguments the defendant sureties, appellants herein, cite Lasley v. United States for Use of Westerman, 285 F.2d 98, Fifth Circuit, which held that the United States District Court had jurisdiction where a subcontractor brought an action under the Miller Act to recover sums due him on a Capehart Housing Project at Fort Bliss, Texas. The circuit court held that the United States District Court had jurisdiction of the action under the Miller Act, although the bonds were executed under the Capehart Act. The court said that even assuming, arguendo, if the above is not true, nevertheless the District Court of the United States had jurisdiction under the concurrent jurisdiction conferred upon it by 28 U.S.C.A. § 1352, which provides that the district courts of the United States shall have original jurisdiction concurrent with state courts of any action on a bond executed under any law of the United States. The case does not hold that the state court does not have jurisdiction.

They also cite Autrey v. Williams et al., 185 F.Supp. 803, in which the United States District Court of Louisiana refused to dismiss an action in that court involving a Capehart bond on the ground that the court was without jurisdiction. The court, without citation of any authority, stated it believed the Miller Act was applicable on the question of jurisdiction, stating in its opinion that the Miller Act and the Capehart Housing Act were harmonious, that Congress intended only one bond be required, that the bond provided by the Capehart Act was substituted for the bond described in the Miller Act, and that the remaining provisions of the Miller Act apply.

Defendants also cite Voelz v. Milgram Contracting Co., 272 Wis. 366, 75 N.W.2d 305; Pierce Contractors, Inc. v. Peerless Casualty Co. (Fla.), 81 So.2d 747; and Gardner v. Roberts-Nash Construction Corporation (N.Y.), Sup., 104 N.Y.S.2d 657. However, none of these cases are in point since the statute there involved was the Miller Act and not the Capehart housing amendment.

The plaintiff cites United States v. Harrison and Grimshaw Construction Co., 305 F.2d 363, Tenth Circuit, where the court held that a housing construction project under the Capehart Act, built by a private entity with private funds at private risk, encumbered by mortgage given by private mortgagor to private mortgagee was not a "public work" within the terms of the Miller Act, although title would eventually vest in the United States. The action was on a contractor's bond and the notice of the claim had been given in accordance with the requirements of the Miller Act but not in accordance with the requirements of the bond. The court held that the bond provisions governed.

In support of its opinion the court cites Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554, where the issue was the right of material suppliers to recover on account of liens on boats built for the United States under state law. Upon default of the contractor, the United States exercised a contract option. It took over the uncompleted boats. The material suppliers claimed a lien under the named law. Their claim was rejected by the court of claims on the ground that the construction contract contemplated that title would eventually vest in the United States and, hence, the United States had "inchoate title" to the materials rendering them public works immune from lien. The Supreme Court reversed saying:

"We cannot agree that a mere prospect that property will later be owned by the United States renders that property immune from otherwise valid liens.

"The sovereign's immunity against materialmen's liens has never been extended beyond property actually owned by it."

The Circuit Court then states:

"In the case at bar the materials were furnished during construction and while the record does not show when, if ever, the housing was taken over by the Secretary or the stock in the mortgagor-builder transferred to him, the statute requires such assumption of control only after completion. Under the principles stated in Armstrong the housing project was a private enterprise and not a public work when the materials were furnished. In such circumstances the Miller Act does not apply."

The court pursued the problem further and points out that the Capehart Act was passed in 1955 and contained no provision for a bond. The provision for bond was added by the 1956 amendment, 42 U.S.C.A. § 1594. The court then reasoned:

"By this amendment Congress recognized the peculiar characteristics of a Capehart Act military housing project. Congress provided for performance and payment bonds with sureties satisfactory to the government and said that the furnishing of such bonds was a sufficient compliance with the Miller Act. It did not say that the provisions of the Miller Act apply to such bonds."

The case then points out that contemporaneous administrative construction aids the court in the resolution of any doubts as to the congressional intent. It points out that less than a month after the 1956 amendment became law, the Federal Housing Administration adopted the regulation that such bond should be satisfactory to the Commissioner and the Secretary of Defense, or his designee, and that the mortgagor and mortgagee shall be named as joint obligees. The court says:

"The naming of the mortgagor and mortgagee as joint obligees is a signifi-cant departure from a Miller Act bond in which the obligee is the United States and points up the private nature of the project."

It also points to further administrative action emphasizing the difference between a Capehart Act bond and a Miller Act bond in that the Capehart bond is written on "FHA Form No. 2452 CP" and that such form is accepted by the United States. The court held the variations between the Miller Act and the Capehart Act caused those charged with its administration to make certain interpretations and adopt regulations. These interpretations made by men charged "with the responsibility of setting its machinery in motion," the court said, are entitled to great weight. The court states it is convinced "that the Miller Act has no application to such a bond." It held that the notice provisions of the bond govern.

Plaintiff also cites Continental Casualty Company v. United States, 305 F.2d 794, from the Eighth Circuit, which case reversed the judgment entered by the United States District Court for the District of North Dakota, reported in D.C., 196 F.Supp. 171. The Circuit Court in that case held that failure of the Capehart housing prime contractor's supplier to give notice, as required by the Capehart bond, precluded the allegedly unpaid supplier from recovery under the bond, although the supplier had met all requirements of the notice provision of the Miller Act.

The Continental Casualty Company case, in the Eighth Circuit, was decided on June 30, 1962, and the Harrison case, in the Third Circuit, was decided on June 29, 1962. Both courts came to the same conclusion in interpretation of the Capehart amendment without apparent assistance from the other. In the Continental case the court refused to apply the procedural provisions of the Miller Act relative to notice and stated:

"* * * we are of the opinion that when Congress amended the Capehart Act in 1956 it recognized that Cape-

hart housing is not conventional Government construction, that the private construction and financing of Capehart housing and the joint administration of the Capehart program by the Department of Defense and the Federal Housing Administration presented problems not encountered in ordinary Government construction, and that it intended, as far as bond protection for laborers and materialmen is concerned, to treat Capehart housing as *sui generis."*

The court then goes on to state it is the court's belief that Congress intended the procedural provisions of the Capehart bond should be worked out as provided by the two agencies involved in the light of the unique nature of Capehart construction and of the peculiar problems which might be encountered in connection with such construction. The opinion continues:

"In our estimation had Congress intended for the procedural provisions of the Miller Act to apply to Capehart contractors and their sureties it simply would have said so."

Both of ·the courts construed the Capehart amendment to take Capehart bonds entirely out of the Miller Act and found that the 1956 Capehart amendment is in harmony with the administrative interpretation which had been placed thereon by the Federal agencies charged with its implementation. Petitions for writs of certiorari were denied by the United States Supreme Court in the Harrison case, 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed.2d 229; and in the Continental case, 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231.

 We believe it is well established that the Capehart Act bond is not controlled by the Miller Act and that the State District Court in and for the county of the State in which the project, or any part thereof, is situated has jurisdiction as provided by the bond.

˙ It is next charged that the trial judge erred in failing to disqualify himself for having prematurely ruled in the case. The case was tried piecemeal. On July 19, 1961, the first day of the trial, one witness was called and a number of exhibits were introduced. Trial was not resumed until November 8, 1961, when additional evidence was adduced. At the conclusion of this portion of the trial neither party rested. There was some informal discussion between the attorneys and the court relative to a later date when the trial would continue but nothing definite was indicated. Thereafter, on December 6, 1961, the court issued and forwarded to the respective attorneys its memorandum decision.

On December 19, 1961, the attorneys for the defendant sureties moved that the judge disqualify himself and a new judge be called to retry the whole case. The ground alleged is that the trial court had already made and entered a decision and that it would require more than the usual evidence and arguments on the part of the defendant sureties to persuade the trial court to change his decision, as it would be impossible for the trial judge to divest himself of his preconceived opinion and to render a fair and impartial trial, and that a mistrial be declared. The motion was argued and the court conditionally denied the motion and postponed final decision until the trial of the case was completed. The trial of the case was then resumed and completed on January 15, 1962.

The court issued its second memorandum decision on February 26, 1962, in which no reference is made to the motion but the court decided the issues, entered findings of fact, conclusions of law and order for judgment, so we must assume that the motion was denied. The charge made in the motion refers to the views the trial judge entertains regarding the subject matter involved. It is premised only on the fact that the judge issued his memorandum opinion before the case was completed and while the trial was in recess.

The transcript indicates the case was loosely tried from a procedural standpoint

and it is indicated by the colloquy of the attorneys at the close of the proceeding on November 8, 1961, that no additional evidence would be introduced. The plaintiff agreed to substitute some exhibits and the attorneys indicated they would argue the case. There is no challenge or indication of mental attitude or disposition of the judge as to any party to the litigation, or that the judge had any pecuniary interest in the outcome of the action, or that he had any overpowering personal spite toward anyone. Neither the cause of nor the motive for any bias is shown. When the court was informed the action had not been completed, it immediately vacated its memorandum decision. The judge's order vacating stated he found no ground upon which he was disqualified.

▇▇▇ The fact that a judge may have an opinion as to the merits of a case does not make him biased and prejudiced. Haslam v. Morrison, 113 Utah 14, 190 P.2d 520. Preconceived opinion as to the law or a misconception of it is not enough to disqualify a judge. Taylor v. Taylor, 185 Va. 126, 37 S.E.2d 886, rehearing den. 185 Va. 416, 38 S.E.2d 449. An erroneous opinion of the law relating to proceedings is not evidence of bias or prejudice on the part of a judge. In re Buchman's Estate, 132 Cal. App.2d 81, 281 P.2d 608, 53 A.L.R.2d 451, cert. den. Buchman v. Morse, 350 U.S. 873, 76 S.Ct. 118, 100 L.Ed. 772. No disqualifying prejudice or bias has been shown. If after losing a case a party could have it retried on motion by disqualifying the judge because he had an adverse opinion on the merits, there would be no end of litigation.

We shall now consider the last error charged, that the written notice of claim was not timely given. The bond provides:

"4. No suit or action shall be commenced hereunder by any claimant.

"(a) Unless claimant shall have given written notice to any two of the following: The Principal, any one of the Obligees, or the sureties above named, before the expiration of the period referred to in condition 2 above, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed * * *."

Condition 2, in part, provides:

"The above named Principal and Sureties hereby jointly and severally agree with the Obligees that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed or materials were furnished by such claimant or before the expiration of the period provided by the law of the place where the project is located for the giving of first notice of a lien of the category claimed by claimant, whichever period be longer, may sue on this bond for the use of such claimant in the name of either of the Obligees or their assignee hereunder, or in the name of the claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon; * * *."

In this case the plaintiff had furnished materials to five corporations, including the prime contractor and four subcontractors. The aggregate amount due from these corporations at the time the entire project was abandoned was the sum of $9,723.03. The plaintiff corporation, in attempting to comply with the requirements of the bond as set forth above, prepared a notice of claim which was sent by registered mail to each of the defendant sureties, the prime contractor and each of the subcontractors, as well as to the seven Grand Forks AFB housing corporations, who were the mortgagor-builders and holders of long-term leases from the Government of the area upon which the 744 housing units were to be constructed.

The first notice of such claim stated it was for materials furnished from March 1, 1960, to May 21, 1960, in the amount of $1,677.34, of which $1,462.43, had been furnished Dakota Lumber, Inc., a subcontractor. This latter amount, however, was in error as the plaintiff corporation omitted therefrom, through inadvertence, an additional charge in the amount of $8,045.69 to said Dakota Lumber, Inc. This amount represented a carload of cedar shingles and nails which was the last carload furnished on a bid of several carloads and was not a regular yard billing of the plaintiff corporation but a general office billing. For this reason it was overlooked by the secretary-treasurer when the first notice of claim was prepared. Therefore, a second notice of claim for $8,045.69 was prepared and sent on September 20, 1960. The material described in the claim had been furnished on April 14, 1960. A period of time in excess of five months elapsed between the furnishing of this particular material and the sending of the second notice, and a period of four months elapsed between the time the last materials were furnished and the sending of the second notice of claim. On the basis of these facts, the defendant sureties contend the second notice of claim was not timely and that the claimant could not bring suit or action thereon as more than 90 days had elapsed from the furnishing of the materials and the giving of the notice of claim. The defendant sureties state that if it is found the court has jurisdiction, it does not dispute the first claim in the amount of $1,677.34.

There are seven bonds, one for each of the seven mortgagor-builder corporations who are named as obligees. The mortgagor-builder corporations are the Grand Forks AFB housing corporations, numbered one through seven. Each of said corporations, as a mortgagor-builder, has a contract with the contractor to build a portion of the 744 housing units. A second obligee named in each bond is the lending institution on each project. Progressive Contractors is the principal on each of the seven bonds as

it contracted to build all of the 744 units. The bonds are in varying amounts and aggregate over twelve million dollars. The two defendant surety companies have cosigned each of the seven bonds.

In explaining the purpose of the bond, two identical paragraphs, with the exception of the project number, are set forth in each of the bonds. They state as follows:

"WHEREAS, Principal has entered into a Housing Contract dated August 25th, 1958 with the Mortgagor-Builder and the Department of the Air Force for the construction of an Armed Services Housing Project designated as FHA Project No. 094–81001 Air No. 1 a copy of which Housing Contract is by reference made a part hereof and is hereinafter referred to as the Contract; and

"WHEREAS, Lender under a certain Building Loan Agreement dated August 25th, 1958 has agreed to lend to the Mortgagor-Builder a sum of money to be secured by a mortgage on said project and to be used by the Mortgagor-Builder in making payments to the Principal under said Contract, and the Obligees desire assurance of the prompt payment by Principal for all labor and material furnished in the prosecution of the work provided for in the Contract."

It was the contention of the plaintiff in the lower court, and it is again urged here, that the seven corporate mortgagor-builders (Grand Forks AFB housing corporations, numbered one through seven), the corporate prime contractor (Progressive Contractors, Inc.,), and the corporate subcontractor (Dakota Lumber, Inc.,), all foreign corporations, were fully owned and controlled by one Hal S. Hayes; that therefore the material was, in fact, furnished the owner; that under our statutes on mechanic's liens no notice need be given to perfect a lien against the owner where the materialman furnished the materials under a contract

with the owner and the perfecting of a lien is not limited to any period of time, except the general six-year statute of limitations. Therefore, the notice was timely given under the alternate provision of the bond. The district court in its memorandum opinion stated as follows:

"It is the opinion of the Court that under the Bond 'The period provided by the Law of the place where the project is located for the giving of first Notice of a Lien of the category claimed by the Claimant' is a longer period than the ninety day period mentioned in the Bond, and is a period of time limited only by the six year Statute of Limitation and the provision in the Bond that no suit or action shall be commenced 'after the expiration of one year following the date on which Principal ceases work on the Contract.' "

 We do not feel we can apply the reasoning of the plaintiff and the lower court in a situation such as this. The plaintiff's theory may be applicable to establish the validity of a mechanic's lien filed by the claimant against the owner for materials furnished and used in the work in an ordinary case. We have held that notice under Section 35–12–05, N.D.C.C., is not a prerequisite to the filing of a mechanic's lien where the owner contracts directly with the materialman for the purchase of the material. North Dakota Lumber Co. v. Bulger, 19 N.D. 516, 125 N.W. 883; Pudwill v. Bismarck Lumber Co. (N. D.), 89 N.W.2d 424; and Glock v. Hillestad (N.D.), 85 N.W.2d 568. This, however, is not such a case. This is a suit between a materialman and a surety on a payment bond in which the contractor is the principal and the owner is one of the obligees. The evidence does not establish that the defendant sureties had knowledge of the claimed unity of ownership and control of the corporations. The alternative clause inserted in the bond which may be used for the purpose of computing time, we believe, is intended to provide a formula

applicable to the relationship of the parties as stated in the bond and applies the law of the forum under which it is to be enforced. The relationship of the parties is clearly stated in the bond and governs in computing time when notice of claim must be given. Applying this language Progressive Contractors, Inc., is the contractor and it entered into a housing contract with each of the mortgagor-builders as the owner. Under our statutes, as they then existed, a materialman who was about to furnish materials to the contractor or subcontractor to be used in the construction of the work under a contract with the owner was required to give notice as a prerequisite to obtaining a lien, by registered or certified mail, to the owner stating that he is about to furnish the materials and the probable charge therefor. Section 35–12–05, N.D. C.C.

 In other words, under our statute and the party relationships described in this bond, the materialman furnishing materials to a subcontractor must serve notice on the owner before any materials are furnished stating the probable charge therefor in order to be entitled to a lien. This, we believe, is the "first notice" of a lien of the category intended under the terms of this bond.

Section 22–03–04, N.D.C.C., provides that in interpreting the terms of a contract of suretyship, the same rules are to be observed as in case of other contracts. Section 22–03–03, N.D.C.C., states a surety cannot be held beyond the express term of his contract. Section 9–07–04, N.D.C.C., provides that when a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible, and Section 9–07–06 states the whole of a contract is to be taken together so as to give effect to every part if reasonably practicable. Each clause is to help interpret the other.

 We feel there is nothing ambiguous or uncertain in the language of these bonds

pertaining to the time within which notice must be given. For these reasons we find the 90-day provision is the longer. However, it is equally clear from the language of the bonds that no notice need be given the sureties at all as a condition precedent to bringing suit against them.

 Part 4 of the bond, quoted above, provides that no suit or action shall be commenced unless claimant shall have given written notice to any two of the following: The principal, any one of the obligees, or the surety. Thus, a claimant giving notice to the principal and one of the obligees is permitted to sue the surety on the bond without prior written notice to the surety. We have no statute requiring notice to surety before suit on a suretyship bond in North Dakota. Generally, in the absence of statute to the contrary or provisions in the contract so requiring, notice of default need not be given to the sureties before they can be sued on the obligation, since it is their duty to make inquiry and ascertain whether the principal is discharging the obligations resting on him. 72 C.J.S. Principal and Surety § 253; Stearns, The Law of Suretyship, Section 7.16 (5th Ed. 1951); 50 Am.Jur., Suretyship, Section 42.

Section 22–03–06, N.D.C.C., provides a surety is exonerated:

"4. To the extent to which he is prejudiced by an omission of the creditor to do anything when required by the surety which it is his duty to do."

 It is well settled that the law of the land in existence at the time a contract is entered into forms a part of that contract the same as if the provisions of the law were expressly incorporated therein. State ex rel. Cleveringa v. Klein, 63 N.D. 514, 249 N.W. 118, 86 A.L.R. 1523; Baird v. Gray, 63 N.D. 640, 249 N.W. 718; Werner v. Riebe, 70 N.D. 533, 296 N.W. 422, 156 A.L.R. 1254; Dunham Lumber Co. v. Gresz, 71 N.D. 491, 2 N.W.2d 175, 141 A.L.R. 60; Kaisershot v. Gamble-Skogmo, Inc. (N.D.),

96 N.W.2d 666; and Shimek v. Vogel (N. D.), 105 N.W.2d 677.

 We said in Long v. American Surety Company, 23 N.D. 492, 137 N.W. 41, that where a surety has paid a premium for issuing its bond, it will usually be treated rather as an insurer than according to the strict law of suretyship. This rule, however, does not exempt the beneficiary from living up to the terms of the agreement and the bond provisions are not to be construed strictly for or against either party, but reasonably as to both. In that case the court held that notice was required to be given within the time described in the bond. In a later case, Mountrail County v. Farmers' State Bank, 53 N.D. 789, 208 N.W. 380, the rule of Long v. American Surety Company, supra, was followed. However, the majority of the court in a special concurring opinion, agreed to the application of the rule in those two cases but questioned the broad statement of the rule in the Long v. American Surety Company case in the following language:

"I concur in the order of reversal and in the opinion as prepared by Mr. Justice Burke, particularly wherein it is stated that this case is controlled by that of Long v. American Surety Co., 137 N.W. 41, 23 N.D. 492, but I am not prepared to say that sureties are or should be held to be released in every case where there has been a failure to give a notice of default as required by the terms of the bond. In other words, I question the application of the rule, broadly stated in the Long Case, to a situation in which the prejudice sustained by the sureties would not extend to the obligation previously fixed and determined. To illustrate the distinction in mind: Suppose the first default on a depository bond to have been coincident with the closing of a bank. The bank passes into the hands of a receiver. The insured depositor presents its claim to the receiver, and obtains a receiver's certificate, which it

can readily assign to the sureties, but it neglects for more than 90 days to notify the sureties on the depository bond. The failure to notify in such case could scarcely operate prejudicially to the bondsmen as to the liability which became fixed at the failure of the bank. A notice promptly given would not enable the sureties to reduce the liability or cancel the bond, and they would continue to have the same rights against indemnitors that they had at the time of the failure. As applied to such a situation, it is difficult to see why the failure to give the notice should operate as a complete release. Rather, it seems to me, where there has been a breach of a bond, resulting in a liability for a fixed or determinable amount, the failure to give the notice stipulated for should not wipe out this liability to any greater extent than the prejudice suffered. I think the principle of exoneration to the extent of prejudice, as stated in section 6681 of the Compiled Laws for 1913, is applicable in such a situation. In my opinion, the rule is too broadly stated in the Long Case, but I nevertheless concur in holding that that case is decisive of the present on the facts here involved. * * *"

In the instant case defendant surety companies had knowledge that there were unpaid bills for materials furnished when the first notice was timely given. Furthermore, the indebtedness to the claimant was fixed and did not increase in amount. It does not appear the sureties could have been prejudiced by the omission to serve the second notice of claim within the 90-day period provided in the bond. No fraud or dishonesty is shown. Suit was brought within the one year period as provided by the bond. The obligation placed upon the claimant by the terms of the bond was not broken until the loss had already occurred for which a liability has ensued. We do not believe the surety was in any way prejudiced by the delay in sending notice. A breach of such an obligation should not release the surety from liability but should exonerate him only to the extent to which he is prejudiced by the failure of the claimant to give the required notice, if any. Section 22–03–06, supra.

We would affirm the judgment on the record before us but, because the issue on the question of prejudice to the sureties was not litigated in the lower court, we deem it necessary to the accomplishment of justice that an opportunity be given the defendant sureties to offer evidence, if any they have, on this question. For this reason, we grant a new trial.

MORRIS, C. J., and TEIGEN, BURKE and STRUTZ, JJ., concur.

ERICKSTAD, J., not being a member of this Court at the time of submission of this case, did not participate.