CONTINENTAL CASUALTY COMPANY,
Appellant,

v.

C. O. BRAND, INC., and Hartford Accident and Indemnity Company,
Appellees.

No. 20468.

United States Court of Appeals
Fifth Circuit.

Jan. 25, 1966.

Rehearing Denied March 16, 1966.

John O. MacAyeal, El Paso, Tex., R. Emmett Kerrigan, New Orleans, La., Edward H. Cushman, Philadelphia, Pa. (Deutsch, Kerrigan & Stiles, New Orleans, La., Cushman & Obert, Philadelphia, Pa., Mayfield, Broaddus, MacAyeal & Perrenot, El Paso, Tex., A. Morgan Brian, Jr., New Orleans, La., Kenneth M. Cushman, Philadelphia, Pa., of counsel), for appellant.

William Duncan, El Paso, Tex., Howard B. Brown, Los Angeles, Cal., Robert V. Blade, Oroville, Cal., Brown & Brown, Los Angeles, Cal., Kemp, Smith, Brown, Goggin & White, El Paso, Tex., for appellees.

Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge:

The decisive issue before the Court is the validity of the dual notice provision in the standard Capehart Act [1] payment bond executed on a form prescribed by the Secretary of Defense. This provi-

---

[1]. Act of August 11, 1955, Public Law 84–345, 69 Stat. 646 ff., as amended by Act of August 7, 1956, Public Law 84–1020, 70 Stat. 1110, 12 U.S.C. § 1748 ff. and 42 U.S.C. § 1594 ff.

sion requires, as a prerequisite to suit on the bond, that a Capehart Act supplier give notice of default to any two of the following parties: (1) the prime contractor; (2) any one of the obligees; and (3) the surety. A Miller Act[2] supplier who deals with a subcontractor must give notice of default before commencing suit against the prime's surety, but is required to notify only one person, the prime contractor. The defendant-appellant contends that the plaintiffs, claimants on a Capehart Act bond, failed to give the required dual notice.[3] The plaintiffs-appellees assert that the Miller Act's liberal notice provision controls Capehart Act bonds; that, accordingly, the Secretary of Defense had no authority to provide for dual notice of default.

██ We hold, first, that the Miller Act single notice provision should not be read into a Capehart Act bond. The Capehart Act, as amended, delegates to the Secretary of Defense authority to require Capehart payment bonds containing more stringent notice provisions than are contained in Miller Act bonds. This conclusion is not inconsistent with decisions of this Court holding that the Miller Act controls jurisdiction for actions by suppliers against the prime contractor and the surety. See Autrey v. Williams and Dunlap, 5 Cir. 1965, 343 F. 2d 730; Lasley v. United States for use of Westerman, 5 Cir. 1960, 285 F.2d 98. Second, we hold that the district court's

finding that the claimants here gave the required dual notice is clearly erroneous. We reverse.

## I.

Hal Hayes, Texas, Inc. was the prime contractor, "eligible bidder", on a Capehart project for the construction of 410 military housing units at Fort Bliss, Texas, at a contract price of $6,473,000. The Capehart Act and contract requires the eligible bidder: (1) to organize a corporation, termed the "mortgagor-builder", to hold title to the project until construction is completed; (2) to obtain loans from lending institutions, "mortgagee-lenders", in an amount sufficient to cover the entire cost of the project, including profit; (3) to furnish a performance bond to protect the United States and a payment bond to protect the laborers and materialmen.[4] Complying with these requirements, Hayes organized three corporations as mortgagor-builders (referred to collectively as Nike Village), obtained the necessary financing from two lending institutions, and gave three performance and payment bonds aggregating the full contract price. Continental Casualty Company, here the defendant-appellant, was the surety on the bonds; Nike Village and the lenders were the dual obligees on the bonds.

April 30, 1959, Hayes, through Winn Contractors, Inc.[5] entered into a written

---

2. 49 Stat. 793 (1935) 40 U.S.C. § 270a et seq.

3. Paragraph 4a of the bond reads:
   "4. No suit or action shall be commenced hereunder by any claimant,
   (a) Unless Claimant shall have given written notice to any two of the following: The Principal, any one of the Obligees, or the Surety above named, before the expiration of the period referred to in condition 2 above, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. * * * *"

4. The financing arrangements pemit utilization of private funds (protected by Gov-

ernment mortgage insurance) for Capehart housing construction. Congress devised the scheme because it was reluctant to make large appropriations for new housing needed to help retain skilled personnel in the services. Under the plan, private units own the projects under construction. When the projects are completed the United States assumes ownership and pays off the mortgage in installments with funds that otherwise would have been expended in quarters allowances for military personnel. See Note, 50 Iowa L.Rev. 1217, 1218–19 (1965).

5. Hayes dealt with the subcontractors through Winn Contractors, Inc. Hayes wholly owned and controlled Winn. It is conceded for purposes of this appeal, that

subcontract for the project's earthwork with C. O. Brand Co., an experienced contractor. The contract price was the lump sum of $148,000. Hayes knew that this figure was a gross understatement of the cost of the work. Hayes and Brand had a secret oral agreement that, regardless of the written contract, Hayes was to pay Brand on a unit-price basis for the work performed. The written contract was a sham to deceive their sureties as to the extent of their obligations and thereby protect their limited bonding position with their sureties.

Unluckily for Brand, Hayes reneged on his gentlemen's agreement and insisted on Brand's performing the written subcontract in strict accordance with its ruinous terms. Financial difficulties beset Brand. July 20, Brand wrote Winn requesting adjustment of the subcontract and estimating that $211,837.95 would be necessary to complete it. July 23, Brand wrote a similar letter to Hayes and Winn. No such letter was sent to the surety, Continental, or to the obligees on Continental's Capehart payment bond with Hayes. July 29, 1959, Brand, totally lacking in funds, unable to meet payrolls, and unable to pry loose any payments from Hayes, abandoned the job. At that time Hayes had made progress payments to Brand amounting to $134,-000. Hayes called upon Brand's surety, Hartford Accident and Indemnity Company, to complete the subcontract under Brand's performance bond. Hartford re-

fused. Hayes eventually completed the work at an expense of about $50,000.

Brand's unpaid suppliers of labor and materials brought suit against Continental on its payment bonds with Hayes, and against Hartford on its payment bond with Brand. The suppliers obtained judgment against Hartford aggregating $86,998.94. Hartford paid the judgments, taking subrogations and assignments from the suppliers. Brand then brought this action against Hayes and Continental. Hartford, as subrogee and assignee of the claims of Brand's suppliers of labor and materials, joined Brand's action against Hayes and Continental.

The district court found that Hayes had fraudulently plotted to cause Brand's financial collapse.[6] Accordingly, the court annulled the subcontract between Hayes and Brand, found that a reasonable subcontract price would be $283,-547.33, and entered judgment in quantum meruit against Hayes and Continental in the aggregate sum of $149,843.74 ($62,-844.80 to Brand and $86,998.94 to Hartford). Continental appealed.

On appeal, Continental does not question the district court's finding that Hayes was guilty of fraud vis-a-vis Brand. Continental contends that Brand's agreement with Hayes to conceal the extent of their commitments worked a fraud on the surety. We do not reach this point, because we agree with Continental's contention that the claimants failed to give the dual notice

the contract with Winn was designed to enable Hayes to escape liability to suppliers of labor and materials. On appeal, Continental admits that Hayes and the surety could not escape liability on the payment bonds by relying on this fragile link in the chain of subcontracts.

6. "The acts and conduct of the Hayes Corporations, their officers, agents and employees, * * * were all part of a general plan, plot and scheme to: (1) obtain the signatures of subcontractors to written contracts which were at a variance with prior oral agreements and understandings and to thereby require said subcontractors to agree, in writing, to do work for less money than they expected to receive; (2) do work other and more than

they thought was being required of them; (3) to obtain Performance Bonds and Payment Bonds for the benefit of the Hayes Corporations, well-knowing that the subcontractors, as principals, would not be able to perform the work required of them for the compensation agreed upon; (4) avoid payment of their obligations justly due by refusing to pay or by shifting the obligations to pay to the sureties of the subcontractors; (5) keep and maintain the subcontractors on the construction projects by further promises and representations; and (6) extract letters and documents from the subcontractors purporting to release and exculpate Hayes and the Hayes Corporations and organizations from and of any liability, responsibility, claim and demand."

required as a prerequisite to suit on a Capehart Act bond.

## II.

We discuss, first, the question whether the single notice provision of the Miller Act, 40 U.S.C. § 270b(a), rather than the express dual notice provision of the Capehart payment bond, controls a suit on the bond.

A. Since 1894, the Heard Act and its successor, the Miller Act, have required contractors of public works in the United States to provide bonds for the protection of their suppliers.[7] The Capehart Military Housing Act, as originally enacted in 1955, did not refer to the Miller Act nor did it specifically require that the eligible bidder provide a payment bond for protection of suppliers of labor and materials. Nevertheless, the Secretary of Defense and the Commissioner of Housing required the bond during the first year following passage of the Capehart Act.[8]

To clarify the relationship of Miller Act bond requirements to Capehart housing projects,[9] Congress amended the Capehart Act, August 7, 1956, to provide:

Any such contract shall provide for the furnishing by the contractor of a performance bond and a payment bond with a surety or sureties satisfactory to the Secretary of Defense, or his designee, and the furnishing of such bonds shall be deemed a suf-ficient compliance with the provisions of section 270a of Title 40 [The Miller Act], and no additional bonds shall be required under such section.[10]

This amendment to the Capehart Act intensified the ambiguous relationship between that act and the Miller Act.

The Secretary's standard bond was promulgated in 1957 after numerous meetings attended by representatives of bonding companies, the Department of Defense, the Army, Navy, Air Force, Federal Housing Administration, and interested lending institutions.[11] Apparently, all of the agencies read the amendment as delegating to the Secretary of Defense discretionary authority to write a payment bond especially suited to Capehart housing projects.

Section 270a of the Miller Act provides that contractors for certain public works shall furnish a payment bond. Continental points out that the notice provision in § 270b(a) is applicable only to contracts "in respect of which a payment bond is furnished under section 270a * * *." But, Continental argues, the Capehart bond is *not* furnished under § 270a; it is furnished under the Secretary's regulations under the 1956 amendment to the Capehart Act; therefore, § 270b(a) of the Miller Act is not applicable to Capehart bonds. The language in the 1956 amendment providing that a bond satisfactory to the Secre-

---

7. The Heard Act, ch. 280, 28 Stat. 278 (1894), provided for a single bond to protect both the suppliers and the United States. The United States had the exclusive right to sue on the bond for the first six months after completion of the work. This often resulted in extended delays to the suppliers. The Miller Act was intended to eliminate the difficulties by providing for both a performance bond and a payment bond, giving the suppliers the right to sue on the payment bond. See MacEvoy v. United States for Use and Benefit of Calvin Tomkins Co., 1944, 322 U.S. 102, 104, 64 S.Ct. 890, 88 L.Ed. 1163.

8. After enactment of the Capehart Act, the Commissioner of Housing promulgated comprehensive regulations (21 Federal Register 319; 20 Federal Register 5969,

5970.), Sec. 292a27 of which, entitled "Completion Assurance", required a bond to be furnished satisfactory to the Commissioner and the Military. See Hart, The Purpose, Form and Problems of the Capehart Housing Program, 1961 A.B.A. Section of Insurance, Negligence & Compensation Law 231, 237 & n. 22.

9. 102 Cong.Rec. 8874 (1956).

10. Housing Act of 1956, ch. 1029, § 507, 70 Stat. 1110, 42 U.S.C. § 1594(a) (1958).

11. Kenney, The Capehart Act Performance and Payment Bonds, 1961 A.B.A. Section of Insurance, Negligence & Compensation Law 251. The dual-obligee bond is Federal Housing Administration Form No. 2452CP. Ibid.

tary "shall be sufficient compliance with § 270a [of the Miller Act]" does not disturb this conclusion, so the argument runs; that language means only that a single bond, the Secretary's, is required for Capehart projects. See Comment, 111 U.Pa.L.Rev. 1014, 1018 (1963).

On the other hand, Hartford and Brand contend that the amendment substitutes the Secretary's bond for the bond § 270a of the Miller Act would otherwise require; that the remaining sections of the Miller Act conferring rights established by the bond required in § 270a apply as well to a substitute bond; therefore the notice provision in § 270b(a) is applicable to Capehart bonds. Accordingly, the appellees contend, the conflicting dual notice provision which the Secretary inserts is unauthorized and void. See Comment, 49 Va.L. Rev. 174, 179–80 (1963).

B. Little legislative history is available. The House and conference reports that accompanied passage of the 1956 amendment to the Capehart Act do not mention the question of single or dual notice. The Senate report declares: "In order to resolve a legal uncertainty concerning the bonding of contractors who build military housing * * * the bill provides that such contractors shall furnish bonds satisfactory to the FHA Commissioner and the Secretary of Defense. This change was recommended by the Department of Defense to conform to the usual FHA bonding requirements." [12]

HR 11742, the final clean bill enacted by Congress as the Capehart Act, succeeded and encompassed an earlier bill, HR 10157. Included as part of the record of the Committee Hearings on HR 10157 was a letter dated June 4, 1956, from the office of the Secretary of Defense to the Chairman of the Congressional Committee conducting the Hear-

ings.[13] In part, the Secretary of Defense wrote:

"It is also recommended that HR 10157 be amended *to make it clear that the provisions of the Miller Act (40 USC 270a) are not applicable to Title VIII Housing. It appears more appropriate to provide for use of the FHA dual obligee bond form for both performance and payment bonds.* The cost of FHA bond is substantially less than the cost of bond required by the Miller Act for public works, so that the proposed amendment will serve to decrease the cost of construction and otherwise facilitate contractual relationships. Accordingly, it is suggested that the following amendment be added to the bill:

'Section 403(a) of the Housing Amendments of 1955 is amended by adding before the final sentence thereof the following: "Any such contract shall provide for the furnishing by the Contractor of a performance bond and a payment bond with a surety or sureties satisfactory to the Commissioner and the Secretary of Defense, or their designees, and the furnishing of such bonds shall be deemed sufficient compliance with the provisions of section 1 of the Act of August 24, 1935, and no additional bonds will be required under such section."' "
(Emphasis added)

The language Congress used in amending the Capehart Act is virtually identical with that recommended by the Secretary of Defense in his letter to the Committee. The letter, however, like the amendment, refers to § 270a only, and does not explain how the suggested amendment would affect other sections of the Miller Act. "Nevertheless" as the Supreme Court of New Jersey observed in discussing the effect of this letter, "the broad language used therein,

---

12. S.Rep. No. 2005, 84th Cong., 2d Sess. 10 (1956).

13. See Hearings on H.R. 10157 before the House Committee on Banking and Currency, 84th Cong., 2d Sess. 195–96; 3 U.S. Code Cong.Adm.News (1956) 4509.

i. e., that the amendment be adopted to 'make it clear that the provisions of the Miller Act (40 U.S.C. 270a) are not applicable to Title VIII housing' (which includes Capehart housing), coupled with the reference to use of the approved F.H.A. type bond which contains the provision permitting suit in the appropriate state or federal court [and, we add, the dual notice provision], should not be ignored. It lends persuasive force to the view expounded by the Eighth and Tenth Circuit Courts that by the 1956 amendment to the Capehart Act Congress intended to authorize the Secretary of Defense or his designee in his discretion to approve a bond which sanctioned the bringing of suit therein in a designated state court as well as in an appropriate United States District Court." [14] We do not go that far. But the letter does show that the purpose of the amendment was to approve an FHA type bond denominated a "Dual-Obligee" bond and containing a dual notice provision. [15]

C. Understandably enough, courts have disagreed about the applicability of the Miller Act to Capehart bonds. [16] Courts agreeing in the result have diverged widely in the rationale for their holding. [17]

The Tenth Circuit has held that the Miller Act (other than § 270a) is inapplicable to Capehart bonds, because Capehart housing projects are not "public works" within the meaning of the Miller Act. United States for the Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Construction Co., 1962, 305 F.2d 263, cert. denied, 371 U.S. 920, 83 S.Ct. 287. This Court, disagreeing with the Harrison & Grimshaw rationale, has held that § 270b(b) of the Miller Act confers *jurisdiction* for materialmen's suits on Capehart bonds. Autrey v. Williams & Dunlap, 1965, 343 F.2d 730; Lasley v. United States for use of Westerman, 1960, 285 F.2d 98. *Autrey* and *Lasley* accept the principle that a "public work" within the Miller Act is "any work in which the United States is interested and which is done for the public and for which the United States is authorized to expend funds." [18] Under this test, Capehart housing projects are public in nature even before title shifts to the United States. [19]

14. Minneapolis-Honeywell Regulator Co. v. Terminal Constr. Corp., 41 N.J. 500, 514–515, 197 A.2d 557, 565–566 (1964).

15. See footnote 11.

16. See Note, 50 Iowa L.Rev. 1217 (1965).

17. E. g., compare United States for the Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Constr. Co., 305 F.2d 363, (10th Cir.), cert. denied, 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed.2d 229 (1962), (Miller Act notice provision inapplicable to Capehart bonds because Capehart projects held not to be "public works" within meaning of Miller Act) and, Continental Cas. Co. v. United States for the Use and Benefit of Robertson Lumber Co., 305 F.2d 794 (8th Cir.), cert. denied, 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962) (Miller Act notice provision inapplicable to Capehart bonds because Capehart notice provision is a "procedural" provision which Secretary of Defense may prescribe.)

18. Peterson v. United States for Use of Marsh Lumber Co., 6 Cir. 1941, 119 F.2d 145, 147 (federal flood control funds used for relocation of railroad bed and

track). See also United States, to use of Noland Co., Inc. v. Irwin, 1942, 316 U. S. 23, 29, 62 S.Ct. 899, 902, 86 L.Ed. 1241 (federal funds used to construct library at Howard University); United States for the Use of Gamerston & Green Lumber Co. v. Phoenix Assurance Co., N.D.Cal.1958, 163 F.Supp. 713 (nonappropriated federal funds used to build library for use of personnel at military post).

19. The "private" company building a project is a skeleton corporation with no interest in the property except to hold title until the United States assumes ownership upon the project's completion. The private funds financing the building are fully protected by Government mortgage insurance. The property upon which the houses are built is Government-owned. In addition, the United States provides specifications for the projects, regularly inspects work progress, and maintains substantial control over developments from start to finish. Finally, the housing projects have an important public purpose in that they are designed to improve the quality of the military by helping to retain skilled personnel. See Autrey v.

To construe the Capehart Act as entirely insulating Capehart bonds from the Miller Act would be to assume that Congress delegated to the Secretary of Defense virtually unlimited power to define the rights of suppliers of these important public projects. Something more than an ambiguous amendment to the Capehart Act is necessary before we will attribute to Congress an intention to abandon the policy implicit in the Heard and Miller Acts of defining by statute the rights of suppliers of public works. Similarly, the Eighth Circuit has said: "We * * * do not regard the Robertson opinion [Continental Cas. Co. v. United States for the Use and Benefit of Robertson Lumber Co., 1962, 305 F.2d 794, cert. denied, 371 U.S. 922, 83 S.Ct. 290] as taking Capehart bonds 'out of the Miller Act' in every respect and particularly so far as jurisdictional matters are concerned." Continental Casualty Co. v. Allsop Lumber Co., 1964, 336 F.2d 445, 451.

We carefully limited *Autrey* and *Lasley* to the narrow holding that the *jurisdictional* provision of the Miller Act, § 270b(b), applies to Capehart bonds. We were reluctant to draw from an ambiguous statute an unnecessarily broad rule. Exercising similar caution, this Court addresses itself only to the specific question whether the notice provision of the Miller Act, § 270b(a), applies to this Capehart payment bond.

D. Although we consider Capehart projects "public works," what distinguishes them from the public works for which the Miller Act was designed is the absence of appropriated funds. This is the central fact in the realm of Capehart. As a result, the Secretary of Defense and the Federal Housing Commissioner found it necessary to contrive a complicated three-cornered legal structure: (1) Instead of a prime contractor, there is an "eligible bidder" who receives not a contract but a "letter of acceptability" which he undertakes to carry out at the risk of losing his security. (2) The "mortgagor-builder" is a nominal obligee. (3) The "lender" mortgagee is the only authentic obligee; and, upon default, since the mortgagee may call upon the FHA for its full insurance coverage, the rights of the obligees may be assigned to the FHA. Within this context, the Secretary of Defense, working closely with the FHA Commissioner, fashioned a bond suitable for the elaborate and unique financing scheme established in the Act. The 1956 amendment, providing for a bond "satisfactory to the Secretary", is completely meaningless unless it is construed as delegating flexible authority to the Secretary to require an appropriate bond. At the same time, the absence in the amendment of a clear grant of exclusive authority to the Secretary and the reference to the Miller Act seem to indicate that Congress limited the scope of his authority to prevail over the Miller Act: Capehart bond provisions should prevail, when the provisions are reasonable and peculiarly suited to Capehart projects. The dual notice requirement appears to be just the sort of provision Congress must have had in mind in adopting the amendment the Secretary proposed.

It is evident that Congress envisioned an expansive role for the Secretary of Defense in administering Capehart projects. The Secretary has considerably more authority over Capehart projects than the contracting officer has over Miller Act projects. Indeed, the Capehart Act grants the Secretary almost complete control over the terms of the housing contract and over housing construction. "[E]ach housing unit * * * shall be placed under the control of the Secretary of Defense, or his designee, as soon as the unit is available for occupancy." 42 U.S.C. § 1594.

In an ordinary Miller Act project, notice by the subcontractor's materialmen of the subcontractor's default need go only to the prime contractor. The prime contractor has the option of advancing or withholding payments to the subcon-

Williams & Dunlap, 5 Cir. 1965, 343 F.2d 730, 734; Comment, 49 Va.L.Rev. 174, 175–79 (1963); Comment, 111 U.Pa.L. Rev. 1014–15 (1963).

tractor. If the prime contractor advances payments, he may be able to prevent a loss from his miscalculation of costs by renegotiating with the government. In Capehart projects, however, the principal contractor, or "eligible bidder", is unable to renegotiate his contract because the amount available for the project is strictly limited to the amount of the bid. Since the "eligible bidder" may be reluctant or unable to advance credit to a subcontractor, the surety may feel compelled to advance credit in order to avoid default. The Capehart surety therefore is as much in need of materialmen's notice of default as is the prime contractor in an ordinary Miller Act project. The Secretary's Capehart bond requirement that if notice is given to the "eligible bidder" it must also be given either to one of the bond obligees or to the surety achieves this result.[20]

Another reason why it is reasonable for the Secretary to require especially adequate notice of default to a Capehart surety is that the surety may be liable for a greater amount than a Miller Act surety. The penal amount of a Miller Act payment bond is one-half the contract amount, where the amount does not exceed $1,000,000, forty per cent of the amount when it is between $1,000,000 and $5,000,000, and, in any event, may not exceed $2,500,000.00. 40 U.S.C. § 270a(a). The penal amount of the Capehart payment bond is not limited by statute and may be one hundred per cent of the contract price. In this case, Continental's payment bonds with Hayes for the Fort Bliss project aggregated the full contract price, $6,473,000.

"The interpretation placed upon [the Capehart Act] by the agencies charged with its enforcement is entitled to great weight". Continental Casualty Co. v. United States for the Use and Benefit of Robertson Lumber Co., 8 Cir. 1962, 305 F.2d 797, 799. The interpretation administrators of Capehart projects place upon the Capehart Act, as amended, fortifies our conclusion here. The Secretary of Defense, upon whose recommendation the 1956 amendment was enacted, obviously construed the enactment of the amendment as approval of his view that Miller Act provisions were inapplicable to "the FHA dual obligee bond form" used on Capehart projects. The Federal Housing Administration, insurer of the mortgaged property which is the basis of the intricate Capehart financing, agreed with the Secretary.[21] And the United States General Accounting office has expressed the opinion that the Capehart bonds are "independently established" and that "the Miller Act is not controlling as to them."[22] "While we think that Congress intended that Capehart supplies should have substantive bond protection essentially similar to that afforded Miller Act suppliers, we think also that Congress intended that the procedural provisions of Capehart bonds [for example, the notice provision] should be worked out and prescribed by the two agencies [Department of Defense and Federal Housing Administration] in light of the unique nature of Capehart construction and of the peculiar problems which might be encountered in connection with such construction." Robinson, supra, 305 F.2d at 799.

E. Our decision here not to apply to Capehart payment bonds the Miller Act notice provision, § 270b(a), is not inconsistent with our earlier decisions in Autrey and Lasley to apply to the same bonds the Miller Act jurisdictional provision, § 270b(b). The principal basis for the decision here is that in establishing a unique financial arrangement over which the Secretary of Defense has broad control Congress granted implied authority to the Secretary to establish reasonable notice provisions peculiarly

20. See Comment, 111 U.Pa.L.Rev. 1014, 1017 (1963).

21. Hart, The Purpose, Form and Problems of the Capehart Housing Program, supra, note 4 at 238 & n. 26.

22. United States General Accounting Office Letter B.59805, dated June 11, 1958, reported in Hart, The Purpose, Form and Problems of the Capehart Housing Program, supra note 4 at 238 & n. 27.

suitable for a Capehart project. Nothing in the financing scheme implies a need for a jurisdictional provision different from that prescribed for suits by suppliers of public works in the Miller Act.

In addition, in *Autrey* the Court was unwilling to infer from an unclear statute Congressional sanction for a jurisdictional provision severely diluting the adequacy of suppliers' remedy by not providing for extraterritorial service of process as the Miller Act does. 343 F.2d at 735. By contrast, our refusal here not to apply the notice provisions of the Miller Act does not dilute the long-standing efforts of Congress to secure suppliers' rights. Applying the dual notice requirement does not seem unfair to the plaintiffs in this case. We are persuaded, in part, as was Judge Blackmun, "by the completely unexplained failure of [these] plaintiff[s] to avoid [the] difficulty in the first instance by taking the small trouble to give the dual notice so clearly required by the bond". *Robertson*, supra, 305 F.2d at 800. In the absence of a decision on point in this circuit, Hartford and Brand could not disregard the express notice provision of the bond on which they sue and could not justifiably rely upon a statutory ambiguity and conflicting decisions in other circuits to support a less stringent notice requirement.

F. The result we reach in this case is similar to the result reached by apparently every court that has considered the question,[23] although we may differ from some of the courts in rationale. For example, in Continental Casualty Co. v. United States for the Use and Benefit of Robertson Lumber Co., 8 Cir. 1962, 305 F.2d 797, 798, the court relied, at least, in part, upon its determination that a no-

tice provision is "procedural" rather than "substantive" in finding that the Miller Act notice provision does not apply to Capehart bonds. "Procedural" and "substantive" are words so freighted with conflicting interpretations that we prefer not to apply them in the confusing area of the relationship of the Capehart Act to the Miller Act. We hold only that the 1956 amendment to the Capehart Act, when considered with the scheme of a Capehart project, expresses the will of Congress to delegate to the Secretary of Defense authority to write into Capehart bonds a dual notice provision.

### III.

The remaining question is whether the district court erred in its findings that Brand complied with the dual notice provision of the Capehart bond.

The bond requires written and timely notice to any two of the following: (1) The principal, in this case Hayes; (2) any one of the obligees, in this case Nike Village and the lending institutions; (3) the surety, in this case the appellant, Continental.

There is no suggestion that claimants gave notice either to the lending institutions or to Continental. That leaves Hayes and Nike Village. Brand offers letters he wrote to Hayes and Winn on July 20, 1959, and July 23, 1959, as evidence of notice to his claim to Hayes. Brand further argues that because Hayes wholly owned and dominated NIKE, the letters also constitute notice to NIKE, thereby fulfilling the Capehart requirement of notice to two of the designated parties.

Hayes originally dominated Nike Village in the sense that the mortgagor-builder was a creature of the eligible bid-

23. National State Bank of Newark v. Terminal Constr. Corp., 1963 D.N.J., 217 F. Supp. 341, aff'd, 3 Cir. 1964, 328 F.2d 315. United States for the Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Constr. Co., 10 Cir. 1962, 305 F.2d 363, cert. denied 371 U.S. 920, 83 S.Ct. 287. Continental Cas. Co. v. United States for the Use and Benefit of Robertson Lumber Co., 8 Cir. 1962, 305 F.2d

794. United States, for Use and Benefit of Fogle v. Hal B. Hayes & Associates, Inc., 1963, N.D.Cal., 221 F.Supp. 260, 263. B. C. Richter Contracting Co. v. Continental Cas. Co., 1964, 230 Cal.App. 2d 491, 41 Cal.Rptr. 98. Allsop Lumber Co. v. Continental Cas. Co., 1963, 73 N.M. 64, 385 P.2d 625 (dicta). Ireland's Lumber Yard v. Progressive Contractors, Inc., 1963, 122 N.W.2d 554 (dicta).

der. But this is the case in every Capehart situation. The mortgagor-builder (Nike Village) is an entity established of doctrinaire necessity to own property upon which Capehart projects are built so that the property can be mortgaged in order to obtain building loans from private institutions.[24] But to conclude that, because Nike Village knew what Hayes knew, only notice to Hayes is required would ignore the clear bond requirement of separate notice to two of several designated parties. Such a result would ignore an essential part of Capehart financing that makes notice to the mortgagor-builder important even if notice is also given to the eligible bidder. Under Capehart procedure, the Housing Contract for the Fort Bliss project provides that, upon delivery of the contract, the eligible [bidder] must place in escrow *with the mortgagee* the mortgagor-builder's stock, endorsed in blank, and signed resignations of all the officers and directors of the mortgagor-builder.[25] Thus, at the time the contract is executed the lender (mortgagee) has such control over the mortgagor-builder that notice to the mortgagor-builder is also notice to the lender. This result comports with the purpose of the dual notice provision, which is to provide more adequate notice of default to the surety and lender, those responsible for financing the Capehart project.

Therefore, even if Brand's letters of July 20 and July 23 were timely sufficient notice to Hayes (which we do not decide), the letters were not also notice to Nike Village. The district court erred in finding that claimants in this case met the dual notice requirement of the Capehart bond.

We find it unnecessary to address ourselves to other issues raised.

The judgment of the district court is reversed.

---

24. See Hart, supra note 4 at 233.

25. Article XV of the Housing Contract provides:

(24) The eligible builder simultaneously with the delivery of this Housing Contract shall deposit in escrow with the mortgagee resignations of the officers and directors of the mortgagor-builder, together with certificates, endorsed in blank, representing all of the capital stock of the mortgagor-builder, for delivery to the Department either (i) upon issuance of the Determination of Completion and the final endorsement of the mortgage note for mortgage insurance by the Commissioner, or (ii) upon complete termination of the Housing Contract for the convenience of the Department prior to completion of the project, whichever event occurs first. The escrow agreement shall be in a form acceptable to the Department and the Commissioner * * *