## Klein Estate.

Argued January 8, 1968.  Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*Donald K. Bobb,* with him *George B. Balmer, Sidney L. Wickenhaver,* and *Balmer, Kershner, Mogel & Speidel,* and *Montgomery, McCracken, Walker & Rhoads,* for appellant.

*Jan L. Deelman,* with him *Levan and Deelman,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, March 15, 1968:

On December 23, 1953, the decedent, William E. Klein, executed his will. This will created two trusts, each to contain one-half of the residue of his estate after payment of taxes. Decedent's then wife, Mabel E. Klein, was given a life estate in one of the trusts with a power of appointment. The second trust provided for a life estate in Kathryn J. Grier with a limited power to consume, a successor life estate in Mabel L. Klein and then remainder interests to four specified charities. Decedent also created on December 23rd a revocable life insurance trust under which Mabel L. Klein had a life estate, Kathryn J. Grier had the next successor life estate and Gertrude Jordan (decedent's sister) had a second successor life estate with a remainder to the same four charities as were named in decedent's will.

Decedent's marriage to Mabel Klein terminated in a divorce on January 7, 1957. He then executed a codicil to his will dated January 23, 1957 amending his 1953 will to leave the entire residue of his estate to Kathryn J. Grier for life (with a limited power to consume), a successor life estate to Gertrude Jordan and

a remainder to the four charities. On the same date decedent's life insurance trust was amended by eliminating the life estate for Mabel Klein, making Kathryn J. Grier the initial life beneficiary and giving a successor life estate to Gertrude Jordan with remainders to charity. Decedent and Kathryn Grier were married in September of 1960; prior thereto (on August 31, 1960) decedent and Kathryn Grier executed an antenuptial agreement, the validity of which is not here disputed. This antenuptial agreement provided that Kathryn Grier was entitled to one-half of decedent's estate. The only testamentary instruments executed by decedent were the will of 1953 and the codicil of 1957.

The auditing judge below concluded, inter alia, in his adjudication (1) that Kathryn J. Klein (nee Grier) was entitled only to that portion of decedent's estate given to her pursuant to the antenuptial agreement and was precluded from taking a life interest in the residuary trust estate, (2) that the cemetery lot owned by decedent was properly included as an asset of the estate and (3) that the interest on a payment made by the executor to cover a federal tax deficiency represents a distribution to Kathryn J. Klein on account of her interest as a creditor in the estate. Each of these conclusions is attacked in this appeal.

### I.

Appellant, the now Mrs. Klein, insists that she is entitled to both one-half of decedent's estate (as provided in the antenuptial agreement) and a life estate in the remaining half (under the codicil of 1957). She cites as support the following general rule found in Annot., Spouse's Right To Take Under Other Spouse's Will as Affected by Antenuptial or Postnuptial Agree-

ment or Property Settlement, 53 A.L.R. 2d 475, 477 (1957): "It has been quite generally recognized that . . . the intention of the testator governs in a determination as to the right of a surviving spouse to take under the deceased spouse's will notwithstanding the existence of an antenuptial agreement . . . and that, unless a contrary intention is indicated by the instruments, such an agreement . . . does not prevent the survivor from taking under the will of the deceased spouse."

This rule, developed primarily from cases in which the antenuptial or postnuptial agreement was executed *prior* to the execution of decedent's will, is followed in Pennsylvania. See *Brown's Estate,* 340 Pa. 350, 17 A. 2d 331 (1941); *Coane's Estate,* 310 Pa. 138, 165 Atl. 2 (1933); cf. *Pentz's Estate,* 200 Pa. 2, 49 Atl. 361 (1901). Although the rationale of these cases is not clearly articulated, they seem to be based on either of two alternative theories: a surviving spouse should not be deemed to have waived the right to take bequests under a will not in existence when the antenuptial or postnuptial agreement was signed, or the subsequent will evidences an intention of the testator to bestow an additional bounty upon the survivor.[1]

Appellee insists that the factual pattern here presented, i.e., a will executed well before the signing of

---

[1] Cases such as *Loesch's Estate,* 322 Pa. 105, 185 Atl. 191 (1936) seem to indicate that the latter theory was probably intended. After an antenuptial agreement had been signed, the husband in *Loesch* acquired several mortgages in the name of husband and wife as tenants by the entireties. Treating the acquisition of these mortgages as inter vivos gifts to the wife, the Court held that the wife as surviving spouse could take under the agreement and as the surviving entireties tenant. By analogy, a will following an agreement and containing a bequest to the wife could be regarded as the husband's attempt to give an additional benefit to his wife payable at his death. See *Bartle v. Bartle,* 121 Colo. 388, 216 P. 2d 649 (1950); *Berg v. Berg,* 201 Minn. 179, 275 N.W. 836 (1937).

the antenuptial agreement, as well as the language of the agreement itself, dictate a conclusion that appellant is entitled only to that provided for in the agreement. This agreement, in relevant part, states: "4. In consideration of the foregoing covenants, the said parties hereto, upon the decease of the other party, do hereby release, quit-claim and forever discharge the legal representatives of the estate of the other party, as well as all the legatees, devisees or heirs thereof, of and from all rights, claims, demands and interests, in law or in equity whatsoever, which he or she might or could have in or to the other's estate, real and personal, or any part thereof, as surviving spouse.

"5. It is hereby declared that this agreement is entered into by the parties hereto with full knowledge on the part of each of . . . all the rights that, but for this agreement, would be conferred by law upon each in the property or estate of the other, by virtue of the consummation of the said proposed marriage; *and it is the express intention of the parties hereto that their respective rights in and to each other's property or estate, of whatsoever character the same may be, shall be determined and fixed by this agreement."* (Emphasis supplied.)

Our research has disclosed four cases dealing with a situation in which the will preceded the antenuptial or postnuptial agreement. In two of these—*Estate of Buchman,* 132 Cal. App. 2d 81, 281 P. 2d 608 (1955)[2] and *In re Willett's Estate,* 178 Misc. 1000, 36 N.Y.S. 2d 992 (1942)[3]—the will and the agreement

---

[2] The *Buchman* court, although relying upon the California rule that expectancies are waived only where it is evident that the parties contracted with these in mind and their intention to disclaim expectancies is made clear in the instrument, stressed that the will was executed while negotiations for the property settlement were taking place.

[3] In *Willett* the court said that the sequence of execution of the will and agreement (one week apart) was of no significance

were executed at substantially the same point in time. Thus, although each case permitted the surviving spouse to take under the will and the agreement, they are both distinguishable for it was obvious that the decedent must have been aware of the bequests given to his wife by virtue of his will and that the will and agreement were part of a "package deal."

The fact that decedent's will was executed prior to the antenuptial agreement supports a conclusion that Mrs. Klein cannot take under the will. Compare *First National Bank of Princeton v. Miley*, 3 N.J. Super. 348, 65 A. 2d 553 (1949). As an aid to the determination of the intent of the parties when they signed the agreement we may consider the surrounding circumstances. See *McCready's Estate*, 316 Pa. 246, 175 Atl. 554 (1934). Where a husband, after the signing of an antenuptial agreement, executes a will conferring additional benefits upon his wife the inference is great that he intended these benefits to be above and beyond that which is given by the agreement. However, where a will precedes the agreement, the opposite inference is more natural—the husband intends that the agree-

---

because of the rule that a will speaks as of the date of death. Accordingly, appellant points to §14 of the Wills Act of 1947, Act of April 24, 1947, P. L. 89, 20 P.S. §180.14(1) : "Every will shall be construed, *with reference to the testator's real and personal estate*, to speak and take effect as if it had been executed immediately before the death of the testator." (Emphasis supplied.) However, neither the reasoning in *Willett* nor §14 of the Wills Act support appellant's theory for here the issue is what did decedent intend to give his second wife by virtue of the antenuptial agreement and the 1957 codicil. As to the agreement, it needs no citation to support the rule that the relevant time for the ascertainment of decedent's intent is the date of signing. And our cases also hold that the *intention* of a testator is to be determined at the time his will was executed not as of his death. See *Farmers Trust Co. v. Wilson*, 361 Pa. 43, 63 A. 2d 14 (1949) ; *Whiteside's Estate*, 302 Pa. 452, 153 Atl. 728 (1931) ; *Parkin Estate*, 157 Pa. Superior Ct. 476, 43 A. 2d 595 (1945).

ment will settle in futuro all rights and benefits to
which his wife shall be entitled.

The third case, *Darrow Estate*, 164 Pa. Superior Ct.
25, 63 A. 2d 458 (1949), is appellant's strongest case.
In *Darrow*, decedent in a 1935 holographic will left his
estate to his wife. A 1945 separation agreement pro-
vided that neither survivor would claim as "heir to the
deceased, nor the heirs of either against the heirs of
the other by reason of the parties hereto being husband
and wife." This language, said the Superior Court,
should not be extended by implication to include a re-
lease of the right to receive a legacy under the will.
It seems clear that the contract language in *Darrow*—
that neither party would claim as an "heir" by virtue
of their marriage—does not approach the breadth of
language contained in the antenuptial agreement at
issue for here Mrs. Klein agreed that her rights "of
whatsoever character" would be fixed by the agreement.

We believe that *Fratoni Estate*, 413 Pa. 594, 198 A.
2d 507 (1964), the most recent of the four cases, is
controlling. By his 1930 will Mr. Fratoni left his es-
tate to his wife. In 1949, after a separation, a post-
nuptial agreement was executed whereby Mrs. Fratoni
"release[d] and relinquishe[d] to husband all her rights
or claims of dower, inheritance, descent and distribu-
tion, and all other claims or rights growing out of the
marriage relation between said parties, and wife shall
be forever barred from all rights in the estate of hus-
band . . . now owned or hereafter acquired." We held
that under the above quoted language Mrs. Fratoni was
barred from taking under her husband's 1930 will[4] (id.

---

[4] Although not cited by the Court in *Fratoni, Marks's Estate*,
297 Pa. 290, 147 Atl. 54 (1929) supports the conclusion there
reached. In exchange for a yearly annuity of $750.00, Mrs. Marks
agreed in an antenuptial agreement "that 'the use, ownership, con-
trol and disposition of all property . . . of the parties . . . shall
continue and remain in each of them respectively in the same con-

at 597-98, 198 A. 2d at 509) : "It is . . . clear that by the express terms of the agreement, appellant, in precise, definite, unmistakably broad and comprehensive legally binding language, contractually barred herself from any and all interest in her husband's estate. She agreed in a valid writing to be 'forever barred from all rights in the estate of husband, real, personal and mixed, now owned or hereafter acquired.' Appellant did not merely renounce her right to take as an heir, as in Darrow Estate, supra, but she released, relinquished, renounced, surrendered, waived and gave up any and all rights she might have under any circumstances or status to participate or share in the distribution of the assets of her husband's estate."

Similarly, Mrs. Klein agreed that her rights "of whatsoever character" were to be fixed by the antenuptial agreement. The provisions in the *Fratoni* postnuptial agreement and the language employed in the antenuptial agreement here at issue appear to be equally as comprehensive and we thus conclude that Mrs. Klein may not take under both the agreement and her husband's will. Of course, had either the 1957 codicil or the antenuptial agreement clearly demonstrated an intention by decedent that the bequest in the 1957 codicil was to be in addition to that provided for in the agreement, this would be a different case.

## II.

Decedent in 1942 had purchased a 4-grave burial lot in the Masonic section of Laureldale Cemetery. No

---

dition and under the same rights in the law as if the said . . . [husband and wife] were sole and unmarried.'" Mrs. Marks asserted that she was entitled to take as her husband's intestate heir but was rebuffed by this Court on the ground that the agreement by necessary implication excluded any such right. Cf. *Estate of B. L. Dick*, 102 Pa. Superior Ct. 589, 157 Atl. 349 (1931) ; *Morris's Estate*, 22 Pa. Dist. 466 (O. C. Allegheny Cty. 1912).

burials have been made on this lot. Mrs. Klein at her own expense had the decedent interred in a different cemetery; she contends that the burial lot owned by decedent does not constitute an asset of the decedent's estate but rather passes to his intestate heirs. Her contention finds support in the common law rule that, in the absence of a clause in a will specifically disposing of a cemetery lot, this lot passes to the heirs-at-law and not to the beneficiary of a residuary clause. See Note, 109 U. Pa. L. Rev. 378, 397-98 (1961). However, a 1953 amendment to the 1947 Wills Act, provides: "If in a will no express disposition or other mention is made of a cemetery lot owned by the testator at his decease and *wherein he or any member of his family is buried,* the ownership of the lot shall not pass from his lawful heirs by a residuary or other general clause of the will but shall descend to his heirs as if he had died intestate." Act of June 3, 1953, P. L. 278, §1, 20 P.S. §180.14(15) (Supp. 1966). (Emphasis supplied.) Clearly, appellant is not entitled to the lot by the terms of this statute for neither decedent nor any member of his family is there buried. The issue thus confronting this Court is whether the 1953 amendment impliedly requires that, where no member of a decedent's family is buried on a lot owned by decedent, this lot then becomes an estate asset subject to the provisions of a residuary clause. We hold that such is the import of this amendment.

The few Pennsylvania cases prior to the 1953 amendment do not mention whether there were any burials on the contested lots. See *Brewer Estate,* 79 Pa. D. & C. 433 (O.C. Fayette Cty. 1951); *Herb Estate,* 70 Pa. D. & C. 598 (O.C. Allegheny Cty. 1950); cf. *Derby Estate,* 14 Fiduciary Rptr. 66 (O.C. Philadelphia Cty. 1963). The failure to attach any importance to this factor in prior cases is perhaps explainable in light of the fact that the common law apparently made no distinction between lots upon which there were burials

and vacant lots, see Note, 109 U. Pa. L. Rev., supra, although the rationale of the common law cases—preservation of the familial interest in burial lots—would seem to call for just such a distinction. Against this background the 1953 amendment was passed. See §51 of the Statutory Construction Act, Act of May 28, 1937, P. L. 1019, 46 P.S. §551. If the clause "wherein he or any member of his family is buried" is to be given any significance, it must have been intended as a limitation on the common law rule which made no distinction as to the presence or absence of burials. Simply, we conclude that the Legislature decided that the familial interest in cemetery lots would be sufficiently preserved if only those lots actually containing remains passed as if on intestacy and thus decide that Mrs. Klein is not entitled to the Laureldale lot.[5]

### III.

The parties have stipulated that the 1961 federal income tax joint return for decedent and appellant was prepared by the executor. On the basis of this return a refund of $2,145.49 was paid to the executor and then in turn given to appellant. As a result of an audit of the 1961 return made in December of 1963 it was determined that a deficiency of $2,128.17 was owed.[6]

---

[5] Appellant stresses the fact that one day prior to the day the executor's account was called for audit she, at her own expense, ordered that a monument bearing Masonic symbols be erected in the memory of her husband on the Laureldale lot. She argues that this constitutes a "dedication" of the lot but we fail to see how the principals applying to the dedication of streets and the like are here relevant. Nor can the placing of a stone monument be considered the equivalent of a burial of decedent in the lot.

[6] The deficiency resulted from a redetermination of the net profit of one of decedent's businesses and from the elimination of a deduction which had been inadvertently taken twice. We are here not concerned with any liability appellant might assert against the executor for improper preparation of the joint return for the

38

Appellant does not contest the action of the court below in treating this deficiency which was subsequently paid by the executor as a distribution to her but does insist that interest of $278.05 also paid by the executor was not properly chargeable as a distribution to her.

Under 26 U.S.C. §6013(d)(3) the liability for joint tax returns is joint and several.[7] Accordingly, it has been held that a wife was jointly and severally liable for any deficiency on a tax return she filed with her decedent-husband even though she signed the return without any knowledge of its contents. See 5 Std. Fed. Tax Rptr. ¶5020.65 (1968). Since appellant was thus liable for the deficiency, we fail to see how she can assert nonliability for interest on this deficiency since interest is as much a substantive part of the debt owed for taxes as was the principal. See *McDowell National Bank of Sharon v. Vasconi,* 407 Pa. 233, 178 A. 2d 589 (1962) ; *Roos v. Fairy Silk Mills,* 342 Pa. 81, 19 A. 2d 137 (1941).

The decree of the Orphans' Court of Berks County is affirmed. Each party to pay own costs.

Mr. Justice MUSMANNO dissents.

---

sole issue is appellant's liability vis-a-vis the estate for the interest on the deficiency.

[7] Respective rights in a refund check for an overpayment on a joint return is a matter apparently left to state law. See *York Radio and Refrigeration Parts,* 20 Pa. D. & C. 2d 85 (C.P. York Cty. 1959) ; Routch, Post-Mortem Estate Planning, 65 Dick. L. Rev. 113, 122 (1961). Several lower court decisions have thus held that a refund for an overpayment on a joint return filed by decedent and his surviving spouse belongs to the survivor alone and is not an estate asset. See *MacNeill Estate,* 21 Pa. D. & C. 2d 480 (O.C. Montgomery Cty. 1959) ; *Green Estate,* 14 Pa. D. & C. 2d 595 (O.C. Philadelphia Cty. 1958). By parity of reasoning, any deficiency and interest thereon would thus appear to be an obligation of the survivor not the estate, assuming that the right to any refund was here owned by decedent and appellant as tenants by the entireties. See *Jackson Estate,* 33 Pa. D. & C. 2d 402 (O.C. Montgomery Cty. 1964).