## Snyder Estate

*Walton B. Yoder, Jr.,* for petitioner.

*Robert A. Lechowicz,* for widower.

TAXIS, *P.J.,* March 27, 1975.—This matter arises by way of a petition of the executor to vacate the election of Clarence L. Snyder, surviving spouse, to take against the will of his deceased wife.

Decedent died on January 23, 1973. Her will, in substance, created a trust of one third of her residuary estate for the benefit of Clarence L. Snyder for his life (or until remarriage) with remainder to testatrix' six children. The balance of the estate was given outright to the six children.

The petition, as filed, alleged desertion and failure to support on the part of Clarence L. Snyder, but this allegation has been withdrawn. The remaining ground, which is the principal issue now, is that Clarence L. Snyder gave up his right to elect against his wife's will by a certain agreement dated July 21, 1952. The parties were married in 1950. Both had been married previously and both had children from their first marriages. At the time of marriage, each owned a piece of residential real estate. However, they decided to reside together in the wife's home, 222 Hamlin Avenue, Telford. In taking up his residence there, Clarence L. Snyder constructed a garage, at a cost of $1,500, as stated

in the agreement. The parties lived together in this house until Mrs. Snyder died.

The agreement is unusual and is not a model of clarity. It first sets forth, in "Whereas" clauses, that wife owned 222 Hamlin Avenue, that husband, with the consent of wife, built a garage at a cost of $1,500, that ". . . it is the desire of the parties to protect the rights of the said (each other's) children in that the children of the wife shall receive the estate of the wife upon her death, and the children of the husband shall receive the estate of the husband upon his death; . . .," and that wife desired husband to be reimbursed for the cost of the garage. The express provisions of the agreement follow. The first says that 222 Hamlin Avenue is the sole property of the wife and shall become the property of her children upon her death ". . . without any right, title, or interest in the husband except as hereinafter set forth." The second requires wife to pay to husband's children the fair market value of the garage at the time of husband's death, the amount to be determined by qualified brokers.

In spite of the agreement and the provision in testatrix' will for his benefit, Clarence L. Snyder has filed an election to take against the will, and the executor has moved to vacate that election. The issues raised are the validity of the 1952 agreement, the effect of the will upon it, whether it bars the husband's election, and what effect it has in application upon the distribution of the estate.

The record is not wholly satisfactory in determining all of these issues, but certain facts are clear. At the time of their marriage each party had a personal residence. Clarence L. Snyder moved into the home already owned by his wife in Telford. He spent $1,500 of his own funds to build a two-car garage on

the property. After about two years of marriage, the parties agreed that they desired their respective assets or "estates" (at that time, with respect to decedent the Telford property and, in the husband's case, his home or its proceeds) to go to their respective children in the event of their deaths, rather than to each other. As a consequence, the agreement in question was entered into.

The agreement is within the general category of contracts termed "postnuptial agreements." Like their antenuptial counterparts, made prior to marriage, they are, in terms of validity and enforcement, somewhat in a class by themselves. They must not only contain the basic elements of any contract, that is, offer and acceptance together with consideration, but they must also meet certain other requirements which our courts over the years have developed, so that they may not become vehicles for one spouse taking advantage of another. These additional elements are essentially the same for both ante- and postnuptial agreements and on this the following was pertinently set forth in Ratony Estate, 443 Pa. 454, 460, 277 A.2d 791 (1971):

"Because of the different and very intimate relationship of husband and wife . . . *one of two* additional factors has been required to validate ante- and postnuptial agreements . . . That burden [of showing invalidity] can be met by proving *either one* of the two following factors—(1) a reasonable provision for the claiming spouse was not made *at the time of the agreement* or (2) in the absence of such a provision, a full and fair disclosure of the other's worth was not made." (Emphasis in original.)

Before directly applying these concepts to the

agreement at hand, it is necessary to review its provisions and to delineate the intent of the parties to it, regardless of the somewhat inexact wording and format used. This is the standard to be sought in all interpretation of contracts: Robert F. Felte, Inc. v. White, 451 Pa. 137, 302 A.2d 347 (1973). It is first evident that the so-called "Whereas" clauses are, in this case, not limited to a recitation of background facts. They contain not only factual statements and declarations of the parties' intent in entering into the agreement, but also positive statements with respect to the items of agreement, and must be so construed and applied. Next, both parties realized that the investment by husband of $1,500 in wife's real estate would prefer her children to that extent when they inherited the home, and the parties, therefore, provided that the fair market value of the garage should be repaid to husband's children at his death. Of course, husband has not yet died, but the most reasonable interpretation of the agreement is reached by keeping in mind the purpose of this provision, with respect to which the order of the parties' death is not important. We need only note further that the executor has acknowledged in open court the obligation of the estate to reimburse the husband under this provision.

We turn our attention now to the principal issue raised by this agreement, dealing with the provisions regarding the parties' estates. Counsel for the surviving spouse urges us to find this agreement invalid because it does not meet the requirements for an enforceable postnuptial contract. It is not easy to apply the stated requirements (of an adequate provision for the spouse, or full disclosure) to this agreement. Prior to its execution, wife

had freely and voluntarily married husband, and had provided a home for him in the house owned by her at the time of the marriage. The agreement does not, in so many terms, allow wife anything except the right to will her home to her children without interference by husband; but what is implicit is that the parties would live together as man and wife and that husband would support and care for wife in the normal manner. This actually occurred over the ensuing 20 years. Regarding full disclosure, we have no doubt that wife and husband, in 1952 and thereafter, knew the extent of each other's assets, simply because all that either had of any value at that time was their interests represented by their respective homes; moreover, they had already lived together as married persons for two years before the agreement was made, so that, unlike many antenuptial situations, each had had an ample opportunity to learn about the financial and economic condition of the other. The only disclosure that was required in such circumstances was the value and interest of each party in their respective properties, and we have no doubt that both parties had this knowledge.

This agreement is not, in our opinion, a full and comprehensive postnuptial contract and was not meant to be, but instead is a simple bilateral agreement allowing the real estate of each party to descend to his or her children, rather than being subject to any interest in the surviving spouse. This mutuality is sufficient consideration to support the contract: Ratony Estate, supra, 464, 465. The binding effect of these mutual promises is not affected by the fact that one party will presumably die before the other. For, although the survivor will be required to forego his or her rights in the estate of the other, nevertheless, both parties knew that, almost

certainly, one would die before the other. Since neither knew in 1952 which that would be, we would be applying a "hindsight" approach, contrary to the rule in these matters set forth in Kaufmann Estate, 404 Pa. 131, 171 A.2d 48 (1961), if we held that it was necessary to wait until the death of one of the spouses to determine whether some benefit was actually received by the survivor. Clearly, the parties meant to be bound by the agreement when it was drawn; it expresses no intent that its validity be determined some other time. We, therefore, find that the agreement binds both the surviving spouse and the estate of decedent.

Nevertheless, this does not fully answer the question of its effect upon the distribution of the estate. Preliminarily, we have no difficulty in finding that the wife's subsequent will did not affect the validity of the postnuptial agreement. Either party to such an agreement has the privilege to confer upon the other more benefits than the agreement alone provides: Klein Estate, 429 Pa. 27, 31 ff., 239 A.2d 464 (1968). Apparently, decedent desired to do this, as she acquired some assets in addition to her home, and it certainly does not follow that she intended to nullify the existing agreement by her will, even if she had been able to do so. It is certainly not the purpose of postnuptial agreements to prevent one of the parties thereto from giving to the other *more* than the agreement does, especially since the passage of time may indicate that this action is appropriate. We shall, therefore, construe and apply the agreement in accordance with its literal terms, which are that wife's house shall go to her children, and husband's house, or the proceeds therefrom, shall go to his children. There is nothing in the agreement which can be construed to bar an election generally by the surviving spouse to take

against decedent's will, except that in the present circumstances such election cannot extend to wife's house. As to the balance of the estate, the election is valid and must be upheld.

It seems likely that the parties did not form any specific intent as to what would happen to assets other than the houses, since in 1952 all that either of them had or expected to have was the respective real estate, or perhaps proceeds therefrom. However, testatrix accumulated some additional assets, and there is nothing improper or inconsistent in allowing the surviving spouse to have his share of them.

To summarize, we hold: (1) The election of the surviving spouse to take against decedent's will is valid, and (2) it is subject to the 1952 agreement providing for the descent of wife's house to her children, as to which real estate the election shall not apply. Accordingly, the petition to strike the election is dismissed, but the election as filed will be limited to assets other than premises 222 Hamlin Avenue, Telford, Montgomery County, or the proceeds thereof.